**Marian Elizabeth ZANGHETTI, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 58061.**

Court of Criminal Appeals of Texas, Panel No. 1.

July 8, 1981.

George M. Karam, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Winston E. Cochran, Jr., Russell Turbeville and Andy

---

Tobias, Asst. Dist. Attys., Houston, Robert Huttach, State's Atty., Austin, for the State.

Before ONION, P.J., and ROBERTS and ODOM, JJ.

OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for murder, where the punishment was assessed at ten (10) years, probated, following a guilty verdict by the jury.

On original submission the appeal was abated in order that the appellant might be afforded a free transcription of the court reporter's notes, etc. See *Zanghetti v. State,* 582 S.W.2d 461 (Tex.Cr.App.1979). The appeal has now been reinstated.

In two grounds of error appellant challenges the sufficiency of the evidence to sustain the conviction and in two grounds the appellant contends the court erred in permitting the jury, by its charge, to convict her by finding that the offense was committed in a manner different than as alleged in the indictment and by refusing her special requested charge in regard to this matter.

Omitting the formal parts, the indictment in pertinent part reads:

" . . . in the County of Harris and State of Texas one MARIAN ELIZABETH ZANGHETTI hereinafter referred to as the Defendant, heretofore on or about June 9, 1975, did then and there unlawfully intentionally and knowingly cause the death of Stanley Steve Zanghetti by striking his head with a glass bottle and by striking his head with a piece of wood and by means and manner unknown to the Grand Jury . . . . "

■ Appellant contends the evidence was insufficient to establish, beyond a reasonable doubt, her identity as the person who committed the acts as alleged in the indictment.

Allen Smith, a credit manager at a Houston health spa, who had worked at the same company with the deceased in Fort Worth, testified he had spoken to the deceased on Sunday, June 8, 1975, to confirm an interview the next day about employment. The next morning, June 9, 1975, at 10 a.m., he received a telephone call from appellant's daughter, Sherry Shepard, who said her mother had called from out of town and was worried about the deceased, whom she could not reach. Smith was asked to check on the deceased at his apartment. Smith got the impression the deceased might be hurt. At 10:30 a.m. he arrived at the apartment, found the front door unlocked, and entered. He discovered the deceased lying on a couch badly beaten with his hands tied and an orange cord wrapped around the legs. Smith tried to arouse his friend, but received no response other than heavy breathing and snoring. He called an ambulance and the police. Smith later learned the deceased was taken to one hospital and then transferred to the Ben Taub Hospital. That afternoon appellant telephoned Smith, and he informed her that her husband had been seriously hurt and was in the hospital.

On cross-examination Smith stated that two or three weeks before his death the deceased had been very depressed; that he was tired of being a travelling salesman and spoke of going back to become a "hitman" for the mob. Smith thought the deceased was joking. He knew that the deceased had been in a federal penitentiary for jewelry theft, and was on parole or had just gotten off of parole.

Randy Landrum testified for the State. At the time of the alleged offense he was engaged to and living with Sherry Shepard, appellant's daughter. At 3:30 a.m. the appellant called Sherry, and in response to her request, Landrum hitched a ride to the apartment where the appellant and deceased lived to assist the appellant in moving her belongings. The appellant was waiting for him. While helping her move, he looked into the living room and observed the deceased apparently asleep on a couch. The deceased was breathing and snoring. He did not get close enough to observe any injuries though he did see an extension cord around the deceased's legs. Landrum did not see the deceased's hands, but appellant

told him she had tied the deceased's hands. Appellant also told him the deceased was planning to leave her. He placed the belongings in appellant's and deceased's automobile and drove appellant to the apartment where he and Sherry lived. Later in the morning he took the appellant to a doctor and to a bank.

Houston police officer G. E. Cones testified he and officer Farrell responded to a call on June 9, 1975 about 10:30 a.m. and went to the deceased's apartment. He found the deceased unconscious, breathing heavily. There was blood that had run off an ear and the deceased's face was somewhat discolored and swollen. His hands were taped together with adhesive tape in a crisscross manner, and an extension cord was tied or wrapped loosely around his ankles. Cones noticed a medicine bottle on an end table near the couch and some boxes of men's clothing and effects in the living room. The back door was secured by a sawed-off broom stick.

Detective David Collier testified he went to the hospital on June 10, 1975, but found the deceased unconscious. He left a message for the appellant to contact him. The next day appellant came to his office wearing a neck brace with bruises on her face. She told Collier she had been beaten by her husband several days earlier. She stated she had slipped some crushed Valium into his coffee in order that she might leave while he was drugged. She denied having tied up or beaten the deceased.

On June 12, 1975, officers Collier and Cones executed a search warrant at appellant's apartment. A tape dispenser, a roll of tape, an electrical cord, two vials, a bottle of Passport Scotch whiskey, and a wooden broom or mop handle were recovered from the apartment.

It was shown that a known fingerprint of the appellant matched a latent print found on the partial roll of adhesive tape "inside the cover of the tape." No identifiable prints were lifted from the bottle of scotch.

Dr. John Dickens, surgeon, testified the deceased never regained consciousness after admission to the hospital; that the deceased was treated for massive head trauma that eventually caused his death. The doctor stated the injuries were consistent with having been hit with a bottle and that a stick or any number of household items or any blunt object were possible.

Dr. Ethel Erickson, assistant medical examiner, testified the main cause of death was blunt trauma to the brain of the deceased and that such injuries were consistent with being struck with a liquor bottle approximately one-third full of fluid or with a stick or with other household items such as frying pans or other pots and pans.

The foreman of the grand jury that returned the indictment testified that the grand jury acting with due diligence was unable to determine what weapon, instrument or object was used to inflict the fatal injuries on the deceased other than it was a blunt object of some kind.

A chemist and toxicologist testified he found no blood on the stick or bottle (⅓ full of a liquid) found in the apartment, although he did discover one piece of human hair. The hair coloring was the same as a known specimen of deceased's hair, but identification was not possible as the piece recovered from the bottle was not complete from root to tip.

The appellant denied she killed her husband. She testified that the deceased had just discharged his parole, was tired of his employment as a travelling salesman, and talked of an association with one D. W. Wakefield, whose background was "terrible" as the appellant had a police officer brother check on Wakefield. She related that when she told her husband on a Wednesday night she was leaving him because of this development he began to beat her, dragged her to the bed where he choked her, etc. He removed her set of car keys, cash and credit cards. As a result of her beating, she laid in bed three or four days. On Sunday night as the deceased took a shower she crushed up some Valium pills and placed them in his coffee in order that she might get out the back door. After he fell asleep, she tried to pack a suit-

case but could not because of pain. When her husband began to move, she wrapped an extension cord around his feet but did not tie it. She taped his hands in front of him with adhesive tape. She called her daughter, and the daughter's boyfriend, Lundrum, arrived and helped her move her belongings. She took part of the money from her husband's money clip, recovered the credit cards, keys, etc. As she and Lundrum left, she related the front door was locked with the night latch on. She closed the back door, but the lock was sprung and the stick usually used to block the opening of the back door was left on the bed. She pulled the drapes so no one could see into the apartment. She went to her daughter's apartment and later that morning she went to a doctor and to a bank where she withdrew most of the money in a joint bank account. She had her daughter contact Allen Smith and later in the day she learned from Smith that her husband was in intensive care at the hospital. After receiving a message, she talked to Detective Collier and told him she had put Valium in her husband's coffee. She testified she never denied to Collier she had taped her husband's hands and wrapped the cord around his feet.

William Hillman, III, Pamela Byron and Sherry Shepard all testified their mother's, the appellant, reputation for truth and veracity was good.

The theory of the defense was that after the appellant drugged her husband, taped his hands and wrapped a cord around his feet, and left the apartment, someone entered the apartment and beat him between 3:30 a. m. and 10:30 a. m. on June 9, 1975. There was evidence that the deceased had been in a federal penitentiary as a result of a conviction involving jewelry theft, and that the stolen jewelry had never been recovered, and that it had been suggested that the deceased knew the whereabouts of the stolen items. There was evidence that shortly before his death the deceased had made trips to Oklahoma without the appellant and may have met with "bad" people in Oklahoma.

The court charged the jury on the law of circumstantial evidence.

We conclude, under the circumstances here presented and the rules under which we are required to review the sufficiency of the evidence, that the evidence is sufficient to sustain the jury's verdict.

Appellant also contends that the trial court erred in permitting the jury, over objection, by its charge to convict her by finding that the offense was committed in a manner different than as alleged in the indictment and by refusing her special requested charge in regard to this matter.

The indictment set out at the beginning of the opinion charged the manner and means of the homicide in the conjunctive. The jury was charged as follows:

"Now, if you find and believe from the evidence beyond a reasonable doubt that on or about the 9th day of June, 1975, in Harris County, Texas, the Defendant, Marian Elizabeth Zanghetti, did then and there unlawfully, intentionally, and knowingly cause the death of Stanley Steve Zanghetti by striking his head with a glass bottle, *or* by striking his head with a piece of wood, *or* by means and manner unknown to the Grand Jury as set forth in the indictment, then you will find the Defendant Guilty.

"If you do not so believe, or if you have a reasonable doubt thereof, you will find the Defendant Not Guilty." (Emphasis supplied.)

The appellant objected to the charge and further submitted a special requested charge requesting the charge be submitted in the language of the indictment, that is in the conjunctive rather than in the disjunctive. The only difference between the charge and the special requested charge was the requested substitution of "and" for the underlined "or" in the charge quoted above.

An indictment may allege the several ways and means by which the proof suggests a homicide was committed. *Philpot v. State*, 169 Tex.Cr.R. 91, 332 S.W.2d 323 (1960). *Gentry v. State*, 172 Tex.Cr.R.

345, 356 S.W.2d 793 (1962), held that an indictment for murder may, in a single count, allege jointly different means of killing without rendering the indictment duplicitous. Further, an indictment alleging in the same count that the defendant killed the deceased by striking him with his hand and "in some manner and by some means, instrument or weapon to the grand jury unknown" was held not repugnant. *Helmus v. State*, 397 S.W.2d 437 (Tex.Cr.App. 1965).

█ In 1 Branch's Ann.P.C., 2nd ed., § 523, p. 500, it is written:

If a statute creates only one offense and prohibits something which is not defendant's duty to do, the different phases of the offense—that is, the different ways by which it may be committed— may be alleged in the same count if not repugnant to each other and if the punishment is the same, and the correct way of joining such is by the word 'and,' *and under such joinder proof of any one of such phases so joined is sufficient.*" (Citations omitted.) (Emphasis supplied.)

In *Medina v. State*, 49 S.W. 380 (Tex.Cr. App. 1899), the indictment charged the death of the deceased was occasioned by the defendant by beating her with a stick and a whip and by starving her and by hanging her with a rope. There the court wrote:

" . . . we believe the same was a good indictment, and under it, in our opinion, proof could be made of all of the causes; and, if any one was proved, it would be sufficient, or, if all were proved, and together they cooperated to produce the death of deceased, this could be done."

In *Anderson v. State*, 479 S.W.2d 57, 60 (Tex.Cr.App. 1972), this court also wrote:

"In situations such as this, to avoid possible variance, an indictment could be presented alleging in the conjunctive 'all possible means of doing the killing, including with an instrument to the Grand Jury unknown.' Proof of one of the means would suffice. See *Helmus v. State*, Tex.Cr.App., 397 S.W.2d 437 (1965), and *Burt v. State*, 38 Tex.Cr.R. 397, 40 S.W. 1000." See also *Dovalina v. State*, 564 S.W.2d 378 (Tex.Cr.App. 1978).

In *Brantley v. State*, 522 S.W.2d 519 (Tex.Cr.App. 1975), a murder case, the indictment alleged the defendant killed the deceased by "cutting her with a knife and hitting her in the head with an iron skillet." There the court wrote: "A single offense was involved. Under these circumstances, the Court did not err in refusing to require an election as to the means used to accomplish her murder *and in charging in the alternative both means used in the indictment.*" (Emphasis supplied.)

In 4 Branch's Ann.P.C., 2nd ed., § 1937, p. 256, in speaking of rape indictments under the former code (Article 1183, V.A.P.C., 1925), it was stated:

"An indictment for rape may allege in one count that the rape was committed by force, threats, and fraud, and proof of either will be sufficient." See also *Dyer v. State*, 283 S.W. 820, 823 (Tex.Cr.App. 1925).

And in such case the State is not required to elect. 4 Branch's Ann.P.C., 2nd Ed., § 1937, p. 256.

In *Lucero v. State*, 502 S.W.2d 750, 755 (Tex.Cr.App. 1973), the defendant complained of a fatal variance between the probata and the allegata in a rape case. He contended the indictment alleged the rape offense was committed by "force, threats and fraud," and that the proof offered to support his guilty plea did not show any fraud. The court, citing *Dyer* and Branch's, supra, noted the stipulated evidence showed a rape by force and threats and overruled the defendant's contention that fraud also had to be shown.

The same rule applied in rape prosecutions applied also to burglary prosecutions under Article 1389, V.A.P.C., 1925. *Cowan v. State*, 562 S.W.2d 236, 240 (Tex.Cr.App. 1978).

In a number of cases that have come before this court since the enactment of the current Penal Code the court has been presented with the question of whether a charge was erroneous where the indictment alleged the offense was committed with the

culpable mental states of "intentionally and knowingly" and the court charged the jury to find the defendant guilty if he acted "intentionally or knowingly." In *Mott v. State*, 543 S.W.2d 623 (Tex.Cr.App. 1976), this court held such a charge was not fundamentally defective, and in *Cowan v. State,* supra, at p. 240, it was held not error for the court to overrule the objection to the submission in the charge of the culpable mental states in the disjunctive. See and cf. *Archie v. State*, 615 S.W.2d 762 (Tex.Cr. App. 1981).

In *Ely v. State*, 582 S.W.2d 416 (Tex.Cr. App. 1979), in a prosecution for deceptive business practices, it was not error to submit to the jury culpable mental states in the disjunctive in contrast to the conjunctive pleadings in the information. See also *Moreno v. State*, 541 S.W.2d 170 (Tex.Cr.App. 1976).

In *Cowan v. State*, supra, at p. 240, an aggravated rape prosecution, the indictment alleged the defendant compelled the complainant to "submit and participate." The charge, over objection, used the word "or" instead of "and" between the words "submit" and "participate." The court held there was no error in overruling the objection noting the wording of V.T.C.A., Penal Code, § 21.02(b)(2).

We do not conclude in the instant case the court erred in overruling appellant's objection and special requested charge to the jury.

The judgment is affirmed.