TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-96-00084-CR







Daniel S. De La Garza, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. 0953354, HONORABLE TOM BLACKWELL, JUDGE PRESIDING






A jury found appellant Daniel S. De La Garza guilty of engaging in organized
criminal activity. See Tex. Penal Code Ann. § 71.02(a)(8) (West Supp. 1998). The district court
assessed punishment at imprisonment for five years and a $10,000 fine. 

Appellant brings forward seven points of error by which he challenges the legal and
factual sufficiency of the evidence, complains of error in the court's charge to the jury, and urges
a due process violation arising from the State's alleged failure to disclose favorable evidence. We
will overrule these points and affirm the judgment of conviction.


BACKGROUND


The State called twenty-five witnesses over eight days of testimony and introduced
scores of documents. We will attempt to summarize all of this complex evidence as clearly and
briefly as possible. Throughout the opinion, dollar amounts will be stated in round terms. 

Banker's Protective Life

At the center of the events giving rise to this prosecution was Banker's Protective
Life Insurance Company (Banker's), a small life insurance company headquartered in Austin. In
the summer of 1991, Banker's had recently emerged from supervision by the Texas Department
of Insurance and was a shell corporation with a net worth of $100,000. Kevin Boyd was the
president of Banker's and its principal shareholder.

Appellant was president of DLG Financial Corporation (DLG), an investment
company with offices in The Woodlands. One of appellant's investment activities was buying and
selling mortgage loan pools, the market for which was particularly heated in the early 1990's. (1) 
Beginning in late 1990, Boyd and appellant discussed the possibility of appellant acquiring or
investing in Banker's, which in turn would purchase blocks of life insurance from other insurance
companies and use the assets to invest in pools of mortgage loans.

The opportunity to carry out this strategy presented itself in the form of National
Foundation Life Insurance Company (National), a financially troubled insurance company
headquartered in Fort Worth. In June 1991, National agreed to sell 10,000 life insurance policies 
to Banker's for $3 million. After securing the necessary regulatory approvals, the Banker's-National transaction closed on August 27, 1991. Immediately thereafter, Banker's began buying
and selling packages of mortgage loans at appellant's direction. The jury found that appellant,
acting with the intent to establish, maintain, and participate in a combination and its profits,
secured regulatory approval of the Banker's-National transaction by means of deception, and that
he thereafter misapplied the assets of Banker's. 


Banker's obtains regulatory approval

The Banker's-National transaction required the approval of insurance regulators in
Texas and Delaware, the state in which National was chartered. Regulators from both states were
concerned with Banker's financial condition. Under insurance accounting, an insurer's obligation
to pay under a contract of life insurance is a liability for which the insurer must maintain an
equivalent amount of cash and other assets as a reserve. When a block of insurance is sold by one
insurance company to another (a process called reinsurance), the purchasing company (the
reinsurer) acquires both the liabilities and the reserve assets. Customarily, the selling company
receives its payment by retaining assets equal to the purchase price. In this case, the National life
insurance contracts to be acquired by Banker's represented a $13 million liability. Under their
agreement, National would deliver to Banker's cash and other assets valued at $10 million,
keeping the remaining $3 million in reserve assets as its payment. Thus, to maintain the necessary
balance between liabilities and assets, Banker's needed a capital infusion of at least $3 million. 

The plan conceived by appellant and Boyd called for the necessary capital to come
from DLG, which would invest $5 million in Banker's and receive in return a $5 million surplus
debenture from the insurance company. (2) Initially, appellant proposed to make this investment in
the form of a package of mortgage loans. When the Texas Department of Insurance objected to
this arrangement, appellant agreed to make the investment in cash. On June 26, 1991, to satisfy
regulators that the necessary $5 million was available, Boyd delivered to representatives of the
Texas and Delaware insurance departments copies of an escrow agreement signed by Boyd on
behalf of Banker's, appellant on behalf of DLG, and Park Jones, chairman and chief executive
officer of Provident Bank in Dallas. The agreement, dated June 25, 1991, stated that DLG "has
deposited" $5 million in an escrow account at Provident to be delivered to Banker's at the closing
of the transaction between Banker's and National. This statement was false. Jones testified that
no money had been deposited in Provident by DLG as of June 26.

On July 2, 1991, appellant wrote and deposited two checks, each for $5 million. 
One of these checks was drawn on DLG's Provident account and deposited in DLG's account at
the National Bank of Conroe (Bank of Conroe). The second check was drawn on the Bank of
Conroe account and deposited in the Provident account. On that date, and before the two deposits
were made, DLG's Provident account had a balance of $195,000 and its Bank of Conroe account
had a balance of $6400.

On July 8, Jones notified the Delaware insurance department in writing that DLG's
Provident account had a balance of $5,195,000. Jones acknowledged at trial that this was a ledger
balance only, since the $5 million check deposited by appellant on July 2 had not yet cleared, and
testified that the bank would not have honored any check drawn on those funds. In fact, on July
9, Provident refused to pay appellant's July 2 check due to insufficient funds. Similarly, on July
11, Bank of Conroe refused to pay the check appellant drew on DLG's account in that bank, also
for insufficient funds.

Meanwhile, Texas insurance regulators were concerned that appellant, by his $5
million investment in Banker's, was seeking to obtain control of the company without going
through the statutorily required approval process. They were also concerned that appellant would
use his control of Banker's to make imprudent investments. After extensive negotiations between
Philip Barnes, the Texas Commissioner of Insurance, and attorneys for Banker's, a compromise
agreement was reached. This agreement was memorialized in a letter to Barnes from Banker's
attorney dated August 14, 1991. The letter stated that pursuant to the agreement, Barnes would
"immediately enter an order approving the reinsurance transaction . . . so that the proposed
reinsurance transaction can close with the infusion of $5 million in additional surplus from Mr.
Dan De La Garza in exchange for a surplus debenture." The letter went on to state that the
agreement contained "certain restrictions on investments," among them that "[n]o more than forty
percent (40%) of [Banker's] assets [would be] invested in mortgages" and that "[n]o investments
[would be made] with Dan De La Garza or his affiliates without the prior approval of the State
Board of Insurance." Attached to this letter were affidavits from Boyd and appellant. Appellant's
affidavit stated, "I have entered into a Surplus Debenture with [Banker's] . . . in the approximate
sum of Five Million Dollars." The affidavit continued, "There are no other arrangements between
myself and [Banker's], and no agreements exist that would allow me to . . . gain control of
[Banker's] . . . ." Appellant's affidavit further stated, "I expressly disclaim any interest in or to
control [Banker's], will not act as a consultant to [Banker's], and will not affect operations of
[Banker's]." Similarly, Boyd's affidavit stated that appellant would not directly or indirectly
control Banker's, that appellant had no agreement to act as a consultant to Banker's, and that
appellant would not affect the operations of Banker's. On August 23, 1991, Barnes signed an
order approving Banker's reinsurance agreement with National. Barnes testified that his decision
to issue the order was based on the letter agreement and attached affidavits. 


The National deal closes and Banker's enters the mortgage loan market

On August 27, 1991, representatives from National met appellant, Boyd, and other
Banker's representatives in the boardroom of Provident Bank to close the transaction. Before
closing, the National representatives asked for assurance that appellant's $5 million investment in
Banker's had been made. Michael Batte, National's treasurer, testified that he recalled being told
by either Boyd or a bank officer that the $5 million had been made available to Banker's. Boyd
testified that when this issue came up, appellant left the conference room and returned with Jones,
who assured everyone that the money had been placed in Banker's account at the bank. Satisfied,
the National representatives then had the cash portions of the reserve assets, approximately $7.1
million, wired to Banker's Provident account. On August 30, Banker's issued the $5 million
surplus debenture to DLG.

On the day of the closing, Jones and appellant contracted for Provident to purchase
at par a $5 million mortgage pool from DLG. On August 28, Boyd and Jones contracted for
Banker's to purchase the mortgage pool from Provident, and Boyd authorized Jones to debit
Banker's Provident account for the $5 million purchase price. The reality of this transaction
differed from its surface appearance. Jones testified that Provident never actually bought the loan
package. Instead, as a letter from Jones to appellant dated August 28 described it, Provident
merely agreed to "facilitate" DLG's sale of the loan package to Banker's for a $25,000 fee. This
is also confirmed by an examination of the flow of money. On August 30, 1991, pursuant to the
authorization from Boyd, Provident debited Banker's account for $5 million. This money was not
credited to Provident's own account, however, as it would have been if the loan package had in
fact been purchased from the bank. Instead, Provident credited $4.975 million to DLG's account,
keeping for itself only the $25,000 fee. 


Appellant makes his investment in Banker's

The Banker's-National reinsurance transaction closed without DLG having made
the promised, and financially necessary, $5 million investment in Banker's. This was finally done
on September 3, 1991. On that date, appellant instructed Jones to wire $5 million from DLG's
Provident account to DLG's account at Bank of Conroe. The same day, again at appellant's
instruction, Bank of Conroe wired $5 million from DLG's account to Banker's Provident account. 
The timing of DLG's investment in Banker's became a matter of concern in February 1992, when
Banker's was scheduled for an examination by the Texas Department of Insurance. At Boyd's
request, Jones wrote a letter to Boyd stating that Provident received the $5 million from DLG in
August but failed to credit it to Banker's account until September 3.

Given the complexity of these transactions, it is helpful to summarize the events of
August 27 through September 3, 1991. On August 27, after insurance regulators and National
were falsely assured that DLG had invested the necessary $5 million in Banker's, the acquisition
of National's life insurance policies was completed. As part of the closing, National wired $7.1
million in cash reserves to Banker's. On August 27 and 28, arrangements were made for Banker's
to purchase a pool of mortgage loans from DLG for $5 million, with the transaction structured to
give the appearance that the seller was Provident Bank. On August 30, Banker's paid for the loan
package by transferring $5 million of the $7.1 million it received from National to DLG. On
September 3, after first moving the $5 million from DLG's Provident account to its Bank of
Conroe account, appellant sent the money back to Banker's to satisfy DLG's obligation to invest
$5 million in Banker's. As a practical matter, the assets acquired by Banker's in the reinsurance
transaction were used by DLG to purchase the $5 million surplus debenture.


Banker's purchases more loans

March 17, 1992. On this date, Banker's purchased at par an $895,000 pool of
mobile home loans from Interamericas Investments (IAI). IAI was an investment company with
numerous subsidiaries or affiliated companies, including Bank of Conroe. IAI's chief executive
officer was Hugo Pimienta. Although DLG was not formally affiliated with IAI, DLG and IAI
shared offices and the two companies often dealt with each other. Boyd testified that appellant
arranged this purchase.

Banker's never received the collateral files for this loan pool or any income from
the loans. This is not surprising because the evidence showed that IAI did not own the loans it
purported to sell to Banker's. The loans in fact were owned by the Resolution Trust Corporation
(RTC), which sold them to DLG in April 1992. On March 30, 1992, in another transaction
arranged by appellant, Banker's purported to sell these loans to Integra, Inc., an affiliate of IAI.

May 1, 1992. Again acting on appellant's recommendation, Banker's bought at par
a $2.3 million dollar mortgage loan pool from Arte Corporation, another IAI affiliate, on May 1,
1992. Once again, Banker's never received the loans it purchased. Janet Ward, who was hired
as Banker's controller in September 1992, testified that she discovered in February 1993 that
Banker's had not received the collateral files for the Arte loans. Until that time, no one at
Banker's had noticed that the loan files had not been received or that Banker's had not received
any income from the loans. Ward testified that because the loan files had not been received,
Banker's should not have carried the loans on its books as assets and that, without those assets,
Banker's was insolvent. On May 10, 1993, Boyd on behalf of Banker's, appellant on behalf of
DLG, and Pimienta on behalf of IAI signed a settlement agreement by which other mortgage loans
were delivered to Banker's to substitute for the undelivered Arte loans. The settlement agreement
was made effective December 31, 1992, so that Banker's would be able to report itself solvent for
the year 1992.

September 15, 1992. On this date, Boyd signed a purported contract by which
Banker's agreed to purchase a $3.9 million pool of mortgage loans from Bank of Conroe. This
contract was a sham, as the testimony of Boyd Nelson demonstrated. Nelson was at the time an
officer in the Bank of Conroe real estate department, and his signature appears on the purported
contract. Nelson testified that Bank of Conroe did not sell this pool of loans to Banker's. To the
contrary, on September 15, 1992, Bank of Conroe contracted to sell the loans in question to DLG. 
Nelson said that the page bearing his signature attached to the purported Bank of Conroe-Banker's
contract appeared to have been taken from one of the two original copies of the Bank of Conroe-DLG contract that were prepared and signed.

The reality of the September 15 transactions is that DLG purchased the mortgage
pool from Bank of Conroe for $3.3 million and immediately resold it to Banker's for $3.9 million,
using the money it received from Banker's to pay Bank of Conroe. This can be seen in the bank
records introduced in evidence, which reflect that on September 15, 1992, $3.9 million was wired
from Banker's account at Bank One in Austin to DLG's account at Bank of Conroe. The next day,
$3.3 million was transferred out of DLG's account and posted to Bank of Conroe's ledger account. 
The bogus Bank of Conroe-Banker's contract was apparently intended to hide the fact that
appellant sold the loans to Banker's.

October 1, 1992. Another sham contract, this one dated October 1, 1992, was used
to hide another sale of loans to Banker's by appellant. This contract purported to reflect the sale
of a $1.8 million pool of commercial mortgage loans from the RTC to Banker's. In fact, the RTC
sold these loans to DLG on September 25, 1992, for $1.1 million. Albert Magill, who represented
the RTC in the sale of the loan package to DLG, testified that the RTC did not sell the loans to
Banker's and that his signature on the purported October 1 contract was a forgery. 

As was also true of the September 15, 1992, transaction, bank records demonstrated
that DLG arranged to buy the loans from the RTC, then "flipped" them to Banker's at a $700,000
profit and used the money it received from Banker's to pay the RTC. On October 1, Banker's
wired $1.8 million from its Bank One account to DLG's account at Texas Commerce Bank, from
which DLG then wired $1.1 million to the RTC. 


COMBINATION


Charge on combination

A person engages in organized criminal activity "if, with the intent to establish,
maintain, or participate in a combination or in the profits of a combination, he commits . . . any
felony offense under Chapter 32, Penal Code . . . ." Tex. Penal Code Ann. § 71.02(a)(8) (West
Supp. 1998). A "combination" within the meaning of section 71.02 is "three or more persons
who collaborate in carrying on criminal activities . . . ." Tex. Penal Code Ann. § 71.01(a) (West
1994). Membership in a combination may change from time to time. Id. § 71.01(a)(2). The
statute requires no more than proof of the existence of a combination and that the defendant
committed one of the enumerated offenses in order to facilitate the combination. See Fee v. State,
841 S.W.2d 392, 395 (Tex. Crim. App. 1992).

The indictment in this cause alleged that "Daniel S. De La Garza, Kevin W. Boyd
and Stephen Pence [Banker's corporate secretary], with the intent to establish, maintain, and
participate in a combination and in the profits of a combination," committed the chapter 32
offenses of misapplication of fiduciary property and securing the execution of a document by
deception. See Tex. Penal Code Ann. § 32.45(b) (West 1994) (misapplication of fiduciary
property) & Penal Code, 63d Leg., R.S., ch. 399, sec. 1, § 32.46(a), 1973 Tex. Gen. Laws 883,
941 (Tex. Penal Code Ann. § 32.46(a), since renumbered as § 32.46(a)(1)) (securing execution
of document by fraud). The district court's charge authorized appellant's conviction for engaging
in organized criminal activity if the jury found that "Daniel S. De La Garza, either acting alone
or with Kevin Boyd as a party, as the term has been heretofore defined . . . with intent to
establish, maintain or participate in a combination or the profits of a combination," committed
either or both of the enumerated offenses. (3) Appellant, who did not object to the charge on this
ground, contends on appeal the charge was fundamentally defective because the court did not
require the State to prove and the jury to find "that there were two other members of the
combination besides appellant, and that they were Steve Pence and Kevin Boyd as alleged in the
indictment."

Appellant relies on the opinion in Barber v. State, 764 S.W.2d 232 (Tex. Crim.
App. 1988). In Barber, ten persons were alleged to have engaged in organized criminal activity,
but only five defendants remained at the time the evidence closed and the case was submitted to
the jury. The Court of Criminal Appeals wrote, "The combination could have been proven to be
composed of five members not limited to the defendants on trial." Id. at 234. (4) But the court's
charge, as a necessary predicate to conviction, required the jury to find that each of the five
defendants, and no one else, was a member of the combination. Id. Therefore, applying the rule
that the sufficiency of the evidence is measured against the court's charge, the reviewing court was
"restrained from going outside the five defendants . . . to find a combination." Id. at 235. (5)

Appellant also refers us to Fee. In that case, the issue was not whether the State
proved the alleged combination, but whether it had proved the alleged enumerated offense of theft. 
The trial court's charge required the jury to find that each of the named defendants had conspired
to commit and committed theft. The Court of Criminal Appeals held that while proof that each
named defendant committed the enumerated offense was not required by the statute, the sufficiency
of the evidence had to be measured against the charge given. Fee, 841 S.W.2d at 395.

Barber makes it clear that, contrary to appellant's contention, the State was not
required to prove that each of the three named defendants was a member of the combination. 
Thus, the district court did not err by failing to require the jury to find that the combination in this
cause was made up of the three defendants named in the indictment, and no one else. 

Appellant also argues that the charge was fundamentally defective because it applied
the law of parties to the combination element of the offense. This contention is based on a
misreading of the charge. We have already quoted the relevant language. The charge authorized
a conviction for engaging in organized criminal activity if the jury found that appellant, acting
alone or as a party, committed either or both of the enumerated offenses with the intent to
participate in a criminal combination. The charge applied the law of parties to the commission of
the enumerated offenses, and not, as appellant contends, to the existence of or intent to participate
in the combination.

Point of error five is overruled. 


Proof of combination

Appellant does not contend the State failed to prove the existence of a combination,
but he does argue that the State failed to prove that Pence was a member of the combination. This
argument is based on the same erroneous premise as his complaint regarding the charge. As we
have held, the State was not required to prove that each of the three named defendants was a
member of the combination. And because the court's charge in this cause, unlike the charge in
Barber, did not require the jury to find that the combination consisted of appellant, Boyd, and
Pence, we are not restrained from going outside these three names to find the necessary
combination to sustain the conviction (even without taking Malik into consideration). We
therefore overrule appellant's challenge to the sufficiency of the evidence to the extent it rests on
the contention that each of the three named defendants was not proved to be a part of the
combination. (6) 

ENUMERATED OFFENSES


Securing document by deception

A person commits an offense if, with intent to defraud or harm any person, he, by
deception, causes another to sign or execute any document affecting property or service or the
pecuniary interest of any person. Penal Code, 63d Leg., R.S., ch. 399, sec. 1, § 32.46(a), 1973
Tex. Gen. Laws 883, 941 (Tex. Penal Code Ann. § 32.46(a), since renumbered as § 32.46(a)(1)). 
Among other things, "deception" means creating by words or conduct a false impression of law
or fact that is likely to affect the judgment of another in the transaction, and that the actor does not
believe to be true. Tex. Penal Code Ann. § 31.01(1)(a) (West 1994). At the time in question, this
offense was a third degree felony without regard to the value of the property, service, or interest. 
Sec. 32.46(b).

The indictment alleged that, intending to establish, maintain, and participate in a
combination and its profits, 


Daniel S. De La Garza, Kevin W. Boyd and Stephen F. Pence . . . with the intent
to defraud or harm the Texas Department of Insurance, by deception caused Philip
W. Barnes, Commissioner of the Texas Department of Insurance, to sign and
execute a document affecting the property and service and pecuniary interest of the
policyholders of [Banker's], to wit: [the order approving Banker's reinsurance
agreement with National]; and the deceptive acts of the defendants consisted of the
following: (a) the execution of an escrow agreement dated June 25, 1991
purporting to reflect the deposit and escrow of $5,000,000 for the benefit of
[Banker's]; and (b) the execution of affidavits by defendants Kevin W. Boyd and
Daniel S. De La Garza regarding the defendants' agreement that Daniel S. De La
Garza would not exercise direct or indirect control over [Banker's]; and (c) the
execution of an agreement dated August 14, 1991 between [Banker's] and the
Texas Department of Insurance wherein said company agreed to investment
restrictions with respect to its acquisition of mortgage loans; and (d) oral
representations that Daniel S. De La Garza would not exercise any control over
[Banker's], and oral representations that said defendants would abide by the terms
of the aforesaid affidavits and agreement with the Texas Department of Insurance.



The district court's charge authorized appellant's conviction for engaging in organized criminal
activity by securing the execution of a document by deception if the jury found that "Daniel S. De
La Garza, either acting alone or with Kevin Boyd as a party, as the term has been heretofore
defined . . . with intent to establish, maintain or participate in a combination or the profits of a
combination," caused Barnes to execute the order in question by committing one or more of the
alleged deceptive acts. (7) 

Appellant contends the State failed to prove any of the alleged deceptive acts as a
matter of law and as a matter of fact. In determining the legal sufficiency of the evidence to
support a criminal conviction, the question is whether, after viewing all the evidence in the light
most favorable to the verdict, any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); Geesa v. State,
820 S.W.2d 154 (Tex. Crim. App. 1991); Griffin v. State, 614 S.W.2d 155 (Tex. Crim. App.
1981). When conducting a factual sufficiency review, the evidence is not viewed in the light most
favorable to the verdict. Instead, all the evidence is considered equally, including the testimony
of defense witnesses and the existence of alternative hypotheses. Orona v. State, 836 S.W.2d 319,
321 (Tex. App.--Austin 1992, no pet.). A verdict will be set aside for factual insufficiency only
if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Stone v. State, 823 S.W.2d 375,
381 (Tex. App.--Austin 1992, pet. ref'd as untimely filed). 

Escrow agreement. Both Texas and Delaware insurance regulators conditioned
their approval of the reinsurance agreement on appellant making a $5 million capital infusion into
Banker's. To satisfy the regulators that the necessary investment had been made, Boyd tendered
the June 25 escrow agreement. This agreement, signed by Boyd, Jones, and appellant, falsely
stated that the $5 million was on deposit in an escrow account at Provident Bank. On August 14,
Boyd and appellant tendered affidavits to the Texas Commissioner of Insurance in which they
falsely swore that the $5 million investment had been made. In fact, appellant did not invest the
promised $5 million until after the reinsurance transaction was closed. To hide the fact that the
investment had not been made, appellant undertook the check-kiting scheme to give the appearance
of having $5 million in his Provident Bank account. Based on this ledger entry, but knowing that
the deposited check had not cleared, Jones then certified to insurance regulators that the $5 million
was available. Further, either Boyd or Jones falsely stated at the closing that the money had been
moved into Banker's account. Viewing the evidence in the light most favorable to the verdict, the
jury could find beyond a reasonable doubt that appellant, acting alone or as a party with Boyd, and
with the intent to defraud the Texas Department of Insurance, used the escrow agreement and
other false statements to deceive the commissioner of insurance and thereby fraudulently secure
the execution of the commissioner's order approving Banker's reinsurance agreement with
National.

Investment restrictions. The jury could also conclude beyond a reasonable doubt
that the August 14, 1991, letter agreement was deceptively used by appellant to secure the
execution of the order. One of the restrictions imposed by the letter agreement was that Banker's
would make no investments with appellant. Nevertheless, on August 28, 1991, the day after it
obtained National's assets, Banker's used those assets to purchase a $5 million pool of mortgage
loans from DLG. Boyd, Jones, and appellant used two contracts to make it appear that Banker's
bought the loans from Provident, but in fact the bank merely served as a "straw man" for a
$25,000 fee. Banker's subsequently bought mortgage loans from DLG on at least two other
occasions: September 15 and October 1, 1992. Sham contracts were employed to make it appear
that Banker's bought the loan packages from someone other than DLG.

Appellant argues that Banker's purchases of mortgage loans from DLG did not
violate the letter agreement. He notes that the original draft of the agreement would have provided
that Banker's could do "no business with" appellant, but that the final agreement prohibited
"investments with" appellant. Appellant argues that while the purchase of mortgages from DLG
might have constituted doing "business" with him, it did not constitute "investing" with him. 

The record is silent as to why the wording of the agreement was changed. Even
if we assume that the prohibition on investing with appellant was intended to be narrower than the
previously proposed ban on doing business with him, the jury could reasonably conclude from the
evidence that the agreement was violated. In the September and October 1992 transactions,
appellant arranged to purchase pools of mortgage loans while at the same time agreeing with Boyd
to sell the pools to Banker's at a substantial profit to himself ($600,000 and $700,000,
respectively). Appellant used the money he received from Banker's to pay the original sellers. 
In effect, Banker's financed appellant's purchase of the loans that he then "flipped" to Banker's. 
Viewed in the light most favorable to the verdict, this evidence establishes that Banker's was
investing with appellant contrary to the terms of the letter agreement. 

That Boyd and appellant never intended to abide by the investment restrictions
contained in the letter agreement may be inferred from their subsequent conduct. On August 28,
1991, only two weeks after the letter agreement was signed, Provident was used as a straw man
to make it appear that Banker's was acquiring loans from the bank rather than from DLG. That
Boyd and appellant tried to hide the true nature of Banker's relationship with DLG so soon after
the letter agreement was signed demonstrates their knowledge that they were violating the letter
agreement. This knowledge is also demonstrated in the September and October 1992 transactions,
when sham contracts were drawn up to make it appear that Banker's was purchasing the loans
from Bank of Conroe and the RTC rather than from DLG. 

Affidavits. In their affidavits to the commissioner, Boyd and appellant swore that
appellant would not control Banker's directly or indirectly, act as a consultant to Banker's, or
otherwise affect the operations of Banker's. When the relevant evidence is examined, it is clear
that the jury could find beyond a reasonable doubt that Boyd and appellant made those sworn
statements knowing that they were false and with the intent to deceive the commissioner and
defraud the department of insurance. Boyd testified that he "didn't know anything about buying"
mortgage loans and relied on appellant's expertise. Boyd admitted that neither he nor anyone else
at Banker's performed any due diligence examination of the loan pools Banker's purchased at
appellant's urging, and that no one at Banker's attempted to insure that the loans were delivered
or that Banker's received the income from them. In just the five transactions discussed in this
opinion, Banker's invested $13.9 million in mortgage loan pools on appellant's recommendation
and relying entirely on his alleged expertise. Appellant argues that he was merely a "broker," not
a "consultant." Whatever label appellant attaches to his role, the evidence clearly shows that he
controlled Banker's substantial investments in mortgage loans and thereby significantly affected
Banker's operations.

For the reasons stated, we hold that the evidence is legally sufficient to sustain
appellant's conviction for engaging in organized criminal activity by securing the execution of a
document by deception. Point of error two is overruled.

Factual sufficiency. In his brief, appellant combines his evidentiary points for
discussion and does not separately argue his contention that the evidence is factually insufficient. 
The defense presented no evidence at trial and the facts are essentially undisputed on appeal. To
the extent he addresses the factual sufficiency issue in his brief, appellant merely offers what he
contends are innocent explanations for his conduct. It was for the jury, as trier of fact, to
determine the proper inferences to draw from the evidence. We are not free to reweigh the
evidence and set aside a verdict merely because we feel that a different result is more reasonable. 
Clewis, 922 S.W.2d at 135; Reina v. State, 940 S.W.2d 770, 773 (Tex. App.--Austin 1997, pet.
ref'd). We must maintain appropriate deference to the jury's verdict by finding error only when
the verdict is so against the great weight of the evidence as to be clearly wrong and unjust. Reina,
940 S.W.2d at 773. Even when all the evidence is viewed equally, the jury's verdict finding
appellant guilty of engaging in organized criminal activity by securing the execution of a document
by deception is not manifestly unjust. Point of error four is overruled.


Misapplication of fiduciary property

It is sufficient to sustain appellant's conviction for engaging in organized criminal
activity that the State proved the existence of a combination and that the defendant committed one
of the enumerated offenses alleged in the indictment in furtherance of the combination. Fee, 841
S.W.2d at 395. Nevertheless, we will also address the sufficiency of the evidence with respect
to the other enumerated offense, misapplication of fiduciary property.

A person commits an offense who intentionally, knowingly, or recklessly misapplies
property he holds as a fiduciary or property of a financial institution in a manner that involves
substantial risk of loss to the owner of the property or to a person for whose benefit the property
is held. Tex. Penal Code Ann. § 32.45(b) (West 1994). "Misapply" means to deal with property
contrary to an agreement under which the fiduciary holds the property or a law prescribing the
custody or disposition of the property. Id. § 32.45(a)(2). At the time in question, this offense was
a felony if the amount misapplied was $200 or more. Penal Code, 63d Leg., R.S., ch. 399, sec.
1, § 32.45, 1973 Tex. Gen. Laws 883, 941 (Tex. Penal Code Ann. § 32.45(c)(2), since amended). 

The indictment alleged that, pursuant to the previously alleged combination,


defendants Daniel S. De La Garza, Kevin W. Boyd, and Stephen F. Pence did then
and there intentionally and knowingly . . . misapply property, namely, United
States currency in the amount of more than $100,000, while said property belonged
to a financial institution, namely, [Banker's], and defendants held said property as
fiduciaries . . . and misapplied the property in a manner that involved substantial
risk of loss to the owners of the property and to the persons for whose benefit the
property was held, namely [Banker's] and its policyholders,


. . .


. . . and that said misapplication occurred on or about the following dates and in
the following instances: . . .



The indictment then specifically alleged: (1) the transfer of $4.9 million from Banker's pursuant
to the August 28, 1991 mortgage loan purchase; (2) the transfer of $893,000 from Banker's
pursuant to the March 17, 1992, mortgage loan purchase; (3) the transfer of $2.3 million from
Banker's pursuant to the May 1, 1992, mortgage loan purchase; (4) the transfer of $3.9 million
from Banker's pursuant to the September 15, 1992, mortgage loan purchase; and (5) the transfer
of $1.8 million from Banker's pursuant to the October 1, 1992 mortgage loan purchase. With
respect to each, the indictment alleged that 


said property [was] misapplied contrary to agreements under which the property
was held, namely: 


 [the contract reflecting the sale of the mortgage loans to Banker's];
and


 that letter agreement containing mortgage loan investment
restrictions dated August 17, 1991, by and between Philip W.
Barnes, in his capacity as Commissioner of Insurance for the State
of Texas, and [Banker's] and its agents and representatives;


and contrary to laws prescribing the custody and disposition of the property,
namely [enumerated provisions of the Texas Insurance Code] . . . .



The district court's charge authorized appellant's conviction for engaging in
organized criminal activity by misapplying fiduciary property if the jury found that "Daniel S. De
La Garza, either acting alone or with Kevin Boyd as a party, as the term has been heretofore
defined . . . with intent to establish, maintain or participate in a combination or the profits of a
combination," intentionally or knowingly committed one or more of the five specified acts of
misapplication. (8) Appellant contends the State failed to prove that any of the alleged transactions
was committed contrary to contract, agreement, or statute, or involved a substantial risk of loss.

We have already held that the evidence is legally and factually sufficient to sustain
a finding that Banker's invested with appellant in violation of the letter agreement with the
insurance commissioner, and that he controlled Banker's investments in mortgage loans in
violation of the assurances made in the affidavits attached to the letter agreement. The State also
proved that the alleged loan purchases created a substantial risk of loss for Banker's and its
policyholders. For example, Janet Ward, Banker's controller, testified that Banker's did not
receive the loans it purchased from Arte Corporation on May 1, 1992. Nevertheless, the loans
were booked as assets valued at $2.3 million. According to Ward, Banker's was in fact insolvent
from May 1, 1992, when it bought but did not receive the Arte loans, until May 10, 1993, when
substitute loans were delivered to Banker's by Pimienta and appellant. The jury could conclude
beyond a reasonable doubt that the possibility of insolvency constituted a substantial risk of loss
for Banker's and its policyholders. Further, this conclusion is not contrary to the great weight and
preponderance of the evidence. Points of error one and three are overruled.


OTHER POINTS OF ERROR


Mistake of fact

Appellant complains that the district court erroneously refused several requested
instructions on the mistake of fact defense. A defendant is entitled to this defensive instruction
when there is evidence that, through mistake, he formed a reasonable belief about a matter of fact
and that the mistaken belief negated the kind of culpability required for commission of the offense. 
See Tex. Penal Code Ann. § 8.02(a) (West 1994). 

Appellant first contends he was entitled to mistake of fact instructions regarding
whether he reasonably believed that different loans could be substituted for those specified in the
purchase contracts, whether he reasonably believed that Banker's purchase of bonds from appellant
did not constitute "investing with" appellant as that term was used in the letter agreement with the
insurance commissioner, and whether he reasonably believed the Insurance Code did not govern
his actions. He argues that these beliefs, if true, would negate the allegations that he intentionally
or knowingly misapplied Banker's funds contrary to the terms of the contracts, the letter
agreement, and the code, respectively. 

Asking the jury to decide whether appellant reasonably believed he was entitled to
substitute different loans for those he contracted to sell to Banker's would, in effect, require the
jury to determine the legal effect of the contracts in question. Similarly, the requested instruction
regarding whether appellant reasonably believed he was not "investing with" Banker's would have
asked the jury to decide the legal meaning of appellant's agreement with the commissioner. The
third requested instruction, in effect, would have required the jury to decide the meaning and
application of certain articles in the Insurance Code. These were questions of law. Each of these
requested instructions reduced to the same proposition: that appellant was entitled to an acquittal
if he reasonably believed his actions were legal. A defendant's reasonable belief that the charged
conduct did not constitute a crime is a mistake of law, not a mistake of fact. See Tex. Penal Code
Ann. § 8.03 (West 1994) (mistake of law defense). The district court did not err by overruling
these requested mistake of fact instructions.

Next, appellant urges that the court erroneously refused mistake of fact instructions
as to whether appellant reasonably believed that the promised $5 million capital investment had
been made and that "the mortgage loans being purchased [by Banker's] were of the value
intended." At trial, appellant requested these instructions only with respect to the allegation that
appellant recklessly misapplied Banker's funds. (9) Because the recklessness theory of the offense
was not submitted to the jury, the district court did not err by refusing the requested instruction. 
Under the circumstances, appellant cannot now complain that he was entitled to the requested
instructions as they related to the allegation that he intentionally or knowingly misapplied Banker's
funds. See Posey v. State, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998) (defensive charge is not
applicable to case unless defendant timely requests it or objects to its omission).

Finally, appellant contends the district court should have instructed the jury that he
was entitled to an acquittal if he reasonably believed, at the time he entered into the letter
agreement with the commissioner of insurance, that the escrow agreement "was not the operative
agreement" and that he would not exercise control over Banker's. Appellant argues that such
beliefs would negate the culpability required for the commission of the offense of engaging in
organized criminal activity by securing the commissioner's order by deception.

With regard to the escrow agreement, appellant argues that there was evidence that
he told Jones that the "deal had fallen through" and that he was going to stop the $5 million check. 
He also argues that there was evidence that he told Boyd he was withdrawing from the escrow
agreement. But these facts, if true, would not have negated the allegation that appellant intended
to defraud the department of insurance. Evidence that other members of the combination knew
that appellant had not made the $5 million deposit called for by the escrow agreement did not raise
a question of fact as to whether appellant reasonably believed that the insurance department knew
that the escrow agreement was not "operative." Even if the jury believed the evidence cited by
appellant, it would not have precluded a finding that appellant intended to defraud the insurance
department.

Appellant's alleged belief that his plan to buy and sell mortgage loans on Banker's
behalf would not constitute the exercise of control over the company, like his alleged
misunderstanding of the contracts and agreements he signed, was a mistake of law, not a mistake
of fact. The district court did not err by refusing a mistake of fact instruction on this issue.

The district court did not err by refusing the requested mistake of fact instructions. 
Point of error six is overruled.


Failure to disclose exculpatory evidence

Appellant's last point of error is that the State violated his due process rights by
failing to disclose exculpatory evidence. See Brady v. Maryland, 373 U.S. 83 (1963). The
evidence in question is a finding of fact by a Texas Department of Insurance hearings officer,
following a hearing on Banker's application for approval of amendments to its charter, that
Banker's "has on hand sufficient reserves so as to reserve all of its policies under the provisions
of Chapter 3 of the Insurance Code." The hearing began on August 30, 1991, and concluded at
a second session on September 18, 1991. The finding in question was among several contained
in an October 3, 1991, order approving the charter amendments. Appellant argues that the
hearings officer's finding that Banker's had adequate reserves is inconsistent with the State's
position at trial that appellant failed to make the required $5 million capital contribution. 

This issue was first presented to this Court in a motion to abate the appeal for a
Brady hearing filed by appellant on December 27, 1996. A copy of the October 3, 1991, order
was attached to the motion. Also attached was an affidavit by appellant's attorney that this order
was not disclosed to him before or during trial. We overruled the motion to abate on January 28,
1997. 

Setting aside the question of whether the facts on which this point of error is
predicated are properly before us, we conclude that appellant has not met his burden of
demonstrating that there is a reasonable probability that the result of his trial would have been
different had the hearings officer's finding been disclosed to the defense. See United States v.
Bagley, 473 U.S. 667, 682 (1985). We do not understand the State's position at trial to have been
that appellant never made the $5 million capital investment in Banker's, but that he did not make
it before the reinsurance agreement with National was consummated. The State's evidence showed
that appellant made the $5 million investment on September 3, 1991. The hearing officer's
finding, dated October 3, 1991, that Banker's was adequately reserved at that time was consistent
with this evidence and did not contradict the State's position at trial. The record before us gives
no reason to believe the result of the trial would have been different if the finding in question had
been disclosed to the defense and introduced in evidence. Point of error seven is overruled.

The judgment of conviction is affirmed.



 

 Marilyn Aboussie, Justice

Before Justices Powers, Aboussie and B. A. Smith

Affirmed

Filed: October 22, 1998

Do Not Publish
1. These pools consist of loans secured by mortgages or deeds of trust on residential or
commercial real estate. Lenders package groups of these loans and sell them to investors (a
process sometimes called "securitizing" the loans), thereby obtaining cash to make more loans. 
Purchasers of the pools acquire the right to collect the loan payments, but also assume the risk of
borrower default. As a debt instrument secured by real estate, the price of any given mortgage
loan pool depends on its effective rate of interest, and on the quality of the underlying loans and
the property securing them. A secondary market exists in which mortgage loan pools are bought
and sold in the same manner as other securities.
2. A surplus debenture is a debt instrument under which the issuing insurance company is
obligated to pay only if its surplus capital reaches a certain level. Under insurance accounting,
a surplus debenture is treated as a capital asset of the company.
3. The court instructed the jury on the law of criminal responsibility for the conduct of another. 
Tex. Penal Code Ann. §§ 7.01, 7.02 (West 1994).
4. At the time Barber was tried and decided, the organized crime statute required a combination
of five or more persons. Act of May 27, 1977, 65th Leg., R.S., ch. 346, § 1, 1977 Tex. Gen.
Laws 922 (Tex. Penal Code Ann. § 71.01(a), since amended).
5. The Court of Criminal Appeals has since held that the sufficiency of the evidence is to be
measured against the elements of the offense as defined by a hypothetically correct jury charge. 
Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).
6. As our discussion of the State's proof regarding the enumerated offenses will demonstrate,
the evidence is legally and factually sufficient to establish a combination consisting of Boyd, Jones,
and appellant. Although Jones may not have remained in the combination, Boyd and appellant
remained and were involved in continuing violations of the organized criminal activity statutes. 
See Tex. Penal Code Ann. § 71.03(4) (West 1994).
7. Although an indictment may charge an offense in the conjunctive, the State may satisfy its
burden of proof by proving one element in any conjunctive phrase. Zanghetti v. State, 618
S.W.2d 383, 387-88 (Tex. Crim. App. 1981).
8. The indictment also alleged the reckless misapplication of Banker's property. This theory
of the offense was not submitted to the jury.
9. Appellant's request was as follows: "Also, with regard to all of the accusations of recklessly,
and this again deals with the misapplication aspect of the indictment, if as to all the allegations,
there would be -- there was testimony by Mr. Boyd that there was a reasonable belief that the $5
million capital contribution had been made, that representations as to value and ownership in the
mortgage loans were not only -- not reckless in that he was not aware of any substantial
unjustifiable risks but that they were, in fact, purchasing mortgage loans in the value that they
intended."



en disclosed to the defense. See United States v.
Bagley, 473 U.S. 667, 682 (1985). We do not understand the State's position at trial to have been
that appellant never made the $5 million capital investment in Banker's, but that he did not make
it before the reinsurance agreement with National was consummated. The State's evidence showed
that appellant made the $5 million investment on September 3, 1991. The hearing officer's
finding, dated October 3, 1991, that Banker's was adequately reserved at that time was consistent
with this evidence and did not contradict the State's position at trial. The record before us gives
no reason to believe the result of the trial would have been different if the finding in question had
been disclosed to the defense and introduced in evidence. Point of error seven is overruled.

The judgment of conviction is affirmed.



 

 Marilyn Aboussie, Justice

Before Justices Powers, Aboussie and B. A. Smith

Affirmed

Filed: October 22, 1998

Do Not Publish
1. These pools consist of loans secured by mortgages or deeds of trust on residential or
commercial real estate. Lenders package groups of these loans and sell them to investors (a
process sometimes called "securitizing" the loans), thereby obtaining cash to make more loans. 
Purchasers of the pools acquire the right to collect the loan payments, but also assume the risk of
borrower default. As a debt instrument secured by real estate, the price of any given mortgage
loan pool depends on its effective rate of inter