

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00100-CR

_____

DAVID LEN MOULTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th Judicial District Court
Cass County, Texas
Trial Court No. 2008F00339

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

David Len Moulton[1] and Rebecca Moulton owned a home situated in a heavily wooded area. The property contains a pond which lies approximately 200–250 yards behind the house. Moulton found Rebecca floating in the middle of the pond, unresponsive, and called 9-1-1. Emergency medical personnel were unable to revive her, and she was pronounced dead at Atlanta Memorial Hospital. A jury convicted Moulton for the murder of Rebecca, his wife of sixteen years, and Moulton was sentenced to sixty years' imprisonment.

Moulton appeals his conviction on the ground that the trial court's jury charge, which allowed the jury to convict Moulton of intentionally or knowingly causing the death of Rebecca by asphyxiation by manner and means unknown to the grand jury, was erroneous where the evidence at trial was insufficient to establish that the manner and means was unknown. Moulton also complains that the trial court erred in refusing to quash the State's indictment, that his due process rights were violated because the State failed to disclose *Brady* material, and that the court erred in allowing a medical examiner to read to the jury inadmissible narratives contained in the investigative file. We agree with Moulton that the trial court's charge was erroneous, conclude the error was harmful, and reverse and remand the court's judgment on this basis only.

---

[1]In this opinion, we refer to David Len Moulton as "Moulton," and Rebecca Moulton as "Rebecca."

2

## I.     Factual Background

### A.     April 17, 2004—The Timeline

On the day of her death, Rebecca went to visit her parents, Carrel and Dean Byrum, who lived six to seven miles away.  At approximately 5:30 p.m., Dean drove Rebecca back to her home.  Rebecca and Moulton ordered a pizza.  Moulton received a call from Ambrose James at around 5:50 p.m., requesting assistance for a tree trimming job.  According to Moulton, the pizza arrived just as he was leaving for the tree trimming job.[2]  Aaron Boatman, who delivered the pizza, confirmed that Moulton and Rebecca were both home during the delivery, which occurred around 6:30 p.m.  According to Boatman, Moulton engaged in small talk, did not seem agitated, and Rebecca appeared well and free to move around.  Moulton testified that Boatman "was sitting in his car counting the money when I got in my truck and drove off," but Boatman, who never physically saw the front door close, believed Moulton went into the house after the pizza delivery.

Moulton met James at the tree trimming job, two and a half miles away.  Moulton claimed to be at the job thirty to forty-five minutes at the most.  Moulton returned home between 6:50 and 7:20 p.m. at the latest.  Rebecca was not inside the home, although her vehicle was parked in front.  She had a habit of going walking with her friends.  According to Moulton, he "waited 15, 20 minutes till he got worried and started looking around" for her.  Dean received a call from Moulton at 7:37 p.m. inquiring into Rebecca's whereabouts.  Moulton suggested, "Well, maybe

---

[2]A civil suit had been filed against Moulton, in which he gave testimony.  The testimony presented from Moulton regarding this matter was read from previous testimony he gave in the civil suit.

3

she's walking with [her friend] Leigh." Moulton called Leigh Soloman's number, which "turned out to be a computer line." He went looking for Rebecca because it was getting dark.

Moulton testified he walked to his truck, which was parked in front of the house, and honked the horn. When he heard no response, he drove to the back of the property on the road and honked the horn again. Moulton stated, "I got back in my truck and went down an old county road [driving trail] to the pond. I did not immediately see Rebecca because I was looking through the trees and they [sic] way I was parked, the dam and to the pond would block my view. I pulled up further and saw" Rebecca floating, face down, in the middle of the pond. Moulton also testified he

> jumped out of the truck, ran around the dam and took my boots off and dove head first into the pond. I took maybe two strokes towards [Rebecca] and I rolled her over and I noticed that her lips were blue and her eyes were rolled back into her head. I started swimming back to the shallow end of the pond loosing [sic] her a couple of times because I was going under. I got her to the bank getting her halfway out.

He performed CPR for four to five minutes, retrieved his cell phone from his truck, and called 9-1-1. Below is the 9-1-1 conversation:

Dispatcher: 9-1-1. Do you have an emergency?

Moulton: Yes.

Dispatcher: What's going on?

Moulton: My wife, she's fell in the pond.

. . . .

4

Dispatcher: Ok. Where are you?

Moulton: I'm David Moulton. I'm at 2610 South Williams.

. . . .

Moulton: I can't get her out, hurry.

Dispatcher: Alright. I'm going to get somebody up there.

Advance firefighter and paramedic Daniel Camp responded to the call around 8:00 p.m., along with Tim Tolleson, who was driving an ambulance, and Captain Dale Godwin. Moulton, who appeared concerned, upset, panicked, and wet, said, "Help my wife, you've got to come and help my wife." Moulton led the crew to Rebecca. Camp found that Rebecca "was laying on her back, probably about -- the lower half of her body was still in the water, from waist -- waist down." With Moulton's assistance, 140-pound Rebecca was pulled out of the water, and CPR was started, but proved unsuccessful. The crew "put her on a backboard and into the back of [Moulton's] truck," which was able to drive up the hill to the ambulance. Camp testified he did not suspect a neck injury and that there was no jugular vein distension or distortion or movement of the trachea. The emergency medical assessment was "[s]uspected accidental drowning." Rebecca was taken to the hospital with Moulton in tow. Dean was notified at 8:05 p.m. that Rebecca was in an ambulance.

Moulton's recollection of what occurred when emergency personnel arrived differs from Camp's testimony in a few respects. First, Moulton said,

5

> They went to putting her on a gurney, trying to climb up that hill, and they dropped her a couple of times. We put her in the back of my truck and I drove her up the hill right to the back door of the ambulance. . . . and then for about 15 or 20 minutes worked on her in the ambulance while I was ranting and raving to get her to the hospital because she needed to be in front of a doctor.

Camp and Godwin both testified that Rebecca was never dropped from the gurney. During interviews after her death, Moulton claimed that a small wound on Rebecca's neck was caused by a brass nipple on a C collar. But Camp testified that no C collar was placed on Rebecca.

Rebecca arrived at the hospital in "[f]ull arrest." Based on what was known at the time, her medical records reflected "drowning victim found in pond," and the mechanism of injury was listed as "drowning." Moulton was soon joined at the hospital by various family members. When the Byrums arrived at the hospital "someone said, She choked on pizza and fell in the pond." When asked to speculate, Moulton "thought she had drowned," or may have been nauseated and/or choking on pizza when she fell in the pond. Rebecca's daughter Stephanie Diane Byrum testified that while in the hospital, Moulton told her, "I didn't think you would like me anymore." "He just kept repeating, I'm so sorry." Monique Irwin, Moulton's daughter from a prior marriage, also arrived at the hospital. She

> asked [her] husband and [her] cousin to please take [Moulton] home because there were people who were drunk and making threats.
>
> . . . .

6

I know [Rebecca's] brother Ricky and his wife got into my face, very close proximity when I was standing next to my grandmother and called my dad bad names and saying that he killed her and those kinds of things.

Moulton went home, while other family members remained at the hospital.

## B.    The Investigation

Detective Mark West was called at 10:00 p.m. to begin an investigation of the incident. West called for Moulton to return to the hospital.  While waiting, West photographed the body. On the back of Rebecca's legs, he noticed what appeared "to be a drag mark right here, mud," and "what appeared to be an injury."  West obtained Moulton's statement recounting the evening's events.  He was cooperative and invited West into his home.  West confirmed Moulton had received the pizza and had met with James for the tree trimming job.  However, West stated, "Later on, we learned that his -- from another [unidentified] witness, he was there about ten minutes," instead of the initial twenty to twenty-five minutes Moulton recited in his statement and thirty to forty-five minutes he testified to in his deposition.  West also confirmed that Moulton had placed telephone calls to Dean and Leigh Soloman's number, which "turned out to be a computer line."  From what West could see, there was nothing out of place in the Moulton home, and he did not believe he had probable cause to search the home further.

West examined the pond area the next day.  Hardly any evidence was retrieved since the scene had been trampled on by paramedics and family members who had been to the pond since

7

Rebecca's death. The pond was approximately seven to seven and a half feet deep.[3] "[T]here was no impression or anything where someone might have taken a fall into the pond" and no disturbances around the edge of the pond suggesting Rebecca had tried to crawl out. West remembered that no mud was present under her fingernails. He noted that she was wearing flip-flops to traverse the dense wooded area and leafy trail. To him, it did not appear as if Rebecca had just fallen in.[4]

### C.    Medical Findings/Initial Autopsy Report

The autopsy of Rebecca's body was supervised by Dr. Joni McClain. "The lateral sclerae of the right eye [was] hemorrhagic," which McClain testified could be caused by "[s]ome sort of blunt trauma" directly to the eye prior to death. Because there was no blunt trauma around the eye, the sclerael hemorrhage could have been caused by the extraction, via needle to the eye, of vitreal fluid, which takes place at the hospital prior to autopsy. Also, there was no petechiae present in the eye, which is seen in eighty-five percent of manual strangulation cases. Rebecca had some sign of neck injury close to the collarbone. A "3/16 inch angulated red mark," probing "less than 1/8" of an inch was "present on the anterior neck base just left of midline near the jugular notch," there was puncture of the skin in that area, and Rebecca had "a one inch area of soft tissue hemorrhage within the fat just below the defect." Along the right side of the neck, Rebecca had "[a] 1/2 inch area of intramuscular hemorrhage involv[ing] the superior aspect and inferior

---

[3]This measurement was taken two to three months later.
[4]Conversations with neighbors did not lead to discovery of any evidence.

surface of the right sternocleidomastoid muscle" and a "3/8 inch intramuscular hemorrhage involv[ing] the inferior aspect of the right sternohyoid muscle." Additionally, there were "1/16 inch superficial lacerations [involving] the mucosal surface of the lower lip of the mouth."

Curiously, there were no bruises or abrasions to the surface of Rebecca's neck area, and the autopsy showed that "[t]he remainder of the neck dissection [was] unremarkable and the hyoid bone and thyroid cartilage [were] intact." As explained by defense expert witness, Dr. Robert Bux, "the hyoid bone is the little bone that is above the larynx or the voice box. It's a U-shaped bone and its purpose is to give stability to the upper part of the airway." "[T]he larynx is the voice box . . . it keeps, again, the structure open so you can breathe in and out without it collapsing, without the trachea collapsing and the upper airway collapsing when you breathe." Bux stated there was no way to know whether the 3/16-inch red mark near the jugular notch was a pre- or post-death injury. However, first responder Camp testified there was no jugular vein distension and no signs of neck injury, although medical records establish that the neck was examined. At the hospital, no signs of injury to the neck were documented. There were also no signs of struggle on Rebecca, which would be expected from a healthy adult fighting for their life.[5] A toxicology screen produced no results, and no foreign DNA was found under Rebecca's fingernails.

---

[5]Dr. Bux testified, "I'd expect to see multiple injuries on the skin that could be either straight due to a finger coming in or raking down, getting a scratch, or kind of -- an ellipse from a fingernail mark. I'd expect to see other areas of bruising on the surface of the skin, and abrasions. Those are the things that you typically see on the outside of the neck."

9

Because Rebecca's "[h]eavy lungs with froth in large airways" contained "edema, intra-alveolar hemorrhage and aspirated food," some sort of asphyxia may have been suspected, but was not listed as the medical cause of death (it is possible this was the result of resuscitation efforts). The initial autopsy produced the finding that Rebecca "died as a result of undetermined causes." There was no testimony that any of the injuries noted in the autopsy were life threatening. Under a section labeled "comment," the report also stated: "Based on investigation and injuries found at autopsy, this case is suspicious for homicide. Should additional information become available, the cause and manner of death may be amended." This statement was based on a report created by Justice of the Peace (J.P.) Taylor Mayfield which, Detective West admitted, contained inaccurate statements. Specifically, the J.P.'s report stated that "they are investigating the husband's possible involvement in this incident" during a time when West stated they were only "investigating the death." The report also stated "J.P. Mayfield reports a long history of domestic violence, confirmed through the Atlanta Police Department records," when, in fact, the police department had no record of domestic violence calls concerning Rebecca. While the report stated that "[t]he decedent's brothers told J.P. Mayfield of the reoccurring domestic violence incidents involving the decedent and her husband," West did not verify that Rebecca's brothers made such allegations when he interviewed them. This report was gathered through conversations Mayfield had with family members at the hospital after the time of death was announced. This report was the only "history" of domestic violence provided to the medical

examiner when they deemed the case "suspicious for homicide." McClain testified, "At that point we didn't feel like we could go ahead and call it a homicide.

### D. Amended Autopsy Report/Affidavits

The report was amended (over a year later), not because of additional medical evidence, but due to the delivery of several affidavits obtained by West. The affidavits, while not admitted as exhibits, were read into the record over objections. Summaries of the contents of the affidavits are listed below:

Patty Byrum Affidavit: "Every time I saw Becky she had those earrings on." "I also know that Becky had a necklace that she wore. The necklace is a cross with emerald stones."[6]

Kayla Williams Affidavit: "Jamie told me that Monique told her that Monique had seen drag marks behind the house in the woods." "Jamie told me that they saw a bare footprint on the back porch. The foot print was visible because it was a muddy foot print."

Jeff Walraven Affidavit: Was drinking and smoking marihuana with Moulton and they became pretty drunk. Moulton said, "'I wish I could get rid of my wife.' I was not sure what David meant by that."

Jessica Jeffcoat Affidavit: Rebecca "did not like going down to the pond. My aunt did not like the outdoors."

Allen Williams Affidavit: "I went to David's house to get his guns." "He didn't know if he was going to take his own life or someone else's life. I went over to his house and picked the guns up and noticed that the front door [sic] in the foyer at the front door had been torn up. David said the wood flooring that had been put down had buckled and he removed it." "I know that there is no reason to remove the padding if he was going to replace the wood floor."

---

[6]Family members found it odd that Rebecca was not wearing her jewelry when she was found.

Ted Burkhalter Affidavit:   David asked me about my ex-wife and said it would be cheaper to kill a woman than to divorce a woman.   "I think this was about seven years ago."   "Another time David told me that he would never get a divorce, that it would be cheaper to kill a woman than divorce one."

Janet Giles Affidavit:   "David was very controlling of Rebecca and he would not let Rebecca associate with me or her other friends."   During "the first year and a half of their marriage, I was visiting Rebecca in her trailer."   "David was not at home at the time and I saw that Rebecca had one black eye."   "I asked Rebecca if David gave her the black eye. Rebecca told me that, yes, he did.   She started making excuses for David, saying he was mad."   "I know that Rebecca was a very strong swimmer. . . ."   "I know that Rebecca did not like the bugs or snakes and was not the type of person to wander into the woods."

Joey Byrum Affidavit:   "On Wednesday, May 5, 2004, I was at home and David Moulton called me."   He said, he thought the Fouches burned his house and if the autopsy came back and there are drugs in her system, "I'm going to get those son of a bitches because I know for a fact that they are making methamphetamine and that date rape drug."

Sandra Sandifer Affidavit:   "I considered Rebecca Moulton my best friend and we talked together a lot.   We would talk a lot about our personal lives and family.   Rebecca shared quite a bit of her personal thoughts with me.   The last time I saw Rebecca was at church at the Westgate Baptist Church on Sunday April 11, 2004.   Everything was fine with her. She never told me about David doing anything to harm [her] and Rebecca would have told me if there had been anything happening.   Rebecca and I talked about that specifically early during her marriage with David and she told me that she told David that she was not raised where men hit women and the first time he ever did that to her, she would leave. Rebecca told me she and David were doing well in their marriage and she told me that in the last couple of weeks before her death.   She told me that their financial situation was doing much better than it had been.   I really do not believe that David had anything to do with Rebecca's death."

Sandifer Supplemental Affidavit:   "After my initial statement I recalled that a few weeks before Becky's death she called me very upset because she said David had returned to drinking alcohol."   "She was upset because she said she didn't like how David acts when he is drinking."   "I have never been around David when drinking until recently.   He is completely different when drinking.   I think he might be capable of great violence when under the influence of alcohol."   "I have now talked to my daughter Kayla who got a lot of new information from Stephanie.   Most of it Stephanie has told me now.   She said

12

David's current drinking started causing them problems. She said her dad's stories were starting to contradict each other. She said that she tried very hard to back him up, but now she truly feels that her dad killed her mom."

Elizabeth Browning Guerra Affidavit: "I saw Rebecca in the store again on the 15th of April 2004 and I saw her walk through the store." "Rebecca then smiled at me and raised her sunglasses and I saw that below her right eye was a deep redness, below her right eye and in her right eye." "I also remember an incident in the store two years ago that Rebecca told me David held her face into a pillow and she also told me that she was gasping for air. I think this was just after their house had burned. I asked her why she was not fighting and she told me she couldn't because she couldn't breathe. When I asked her why he did that, she said tempers were short and it was hot and we were closed in."

Leigh Soloman Affidavit: "Regarding the death of Rebecca Moulton, I was Rebecca's friend and associated with Rebecca quite a bit. We went walking for exercise and would talk about different things. Rebecca told me that her and David were getting along fine and there were no major problems between them. I honestly think that if there had been any problems, Rebecca would have told me." "I called David Moulton Sunday night, April 18, 2004, and he told me about Rebecca and he said he tried to call me and that I did not have an answering machine. I have two numbers listed in the telephone book. The first number is for the computer and does not have a caller identification and no answering machine." "I know Rebecca was definitely scared of snakes."

These affidavits were provided to the medical examiner's office, who then amended the autopsy report with a revised cause of death, changing the report from "undetermined" to "homicidal violence," and the manner of death to "homicide."

At trial, McClain stated that the injuries could be indicative of death by asphyxiation. She clarified that "[i]n this particular case we feel the mechanism of death is some sort of asphyxia. Could be drowning, could be strangulation, could be suffocation.[7] We can't specifically pick

---

[7]There is no evidence that Rebecca had water in her lungs.

13

which one, because when you deal with an asphyxial type death, the findings are very subtle." She claimed that the injuries did not happen by themselves and that some force was applied.

**E.      Prior Relationship/Trial Testimony Regarding Abuse**

Guerra testified at trial in addition to signing an affidavit.   She testified that she would see Rebecca on occasion while shopping.   One day (date uncertain) at Wal-Mart, Rebecca was "really withdrawn," and "had some makeup on that was the kind you buy to cover bruises, scars, and things like that."   Guerra knew that Rebecca did not wear much makeup.  She "noticed that [Rebecca] had bruises on the right side of her face" and under her jaw.   Guerra also testified about her sighting of Rebecca in a hardware store in April 2004.

> She was bruised bad, again, that day. . . . She again had bruises on the right side of her face.   She had bruising in her eye.   She had bruising on her, of her right arm. I put my arm around her and put my arm on it, where the bruise was, and she kind of winced and pulled her sleeve, half sleeves, bruised.   Fingerprints on her arm.

Guerra testified Rebecca "said she could not get out of the relationship she was in.   She was afraid to walk away and she was scared to stay."

Soloman, who had also signed an affidavit, testified that she "went walking and shopping" with Rebecca and that Rebecca told her there were no major problems in her marriage.

Rebecca's mother, Dean, said she only saw bruises on Rebecca one time—during the building of the Moulton's second home (the first one burned in a fire).   Sometime prior to Christmas of 2003, Dean testified,

> [T]he side of [Rebecca's] face, from her temple down was blue, dark blue. But she had makeup -- I had talked to her fifteen minutes before, and I hadn't noticed it looking directly at her, but when that sunlight hit her face I could see that dark blue spot, and I said, Becky, what happened to your eye? And she said, I ran into one of those poles, one of those boards.

Dean claimed that Rebecca did not appear to be scared or reluctant to go home.

Moulton's relatives, including Lela Wilbanks and Kevin Irwin, testified that they had never seen bruises on Rebecca. Melissa Byrum, Rebecca's niece, testified that she visited her aunt on the day of her death, did not see any bruises on her, and claimed Rebecca did not seem upset.

Stephanie, Rebecca's daughter who Moulton adopted, described Moulton as "quick to temper." Her testimony was based on incidents that occurred seventeen years ago when she was ten years old. Stephanie testified the relationship "was really bad and rocky. They argued a lot and fought a lot." Although she testified, "I saw a lot of him hitting her," Stephanie did not testify to an incident where she actually saw Moulton hit Rebecca. There were three incidents Stephanie recalled. First, she once saw Moulton swing at her mother with a closed fist and miss. Next,

> [O]ne night they were fighting again and -- I had just -- this time I just heard it and heard them, him hitting her, and she was crying. And after he left, I went back and saw my mom in the bedroom, and she was laying on the floor and covered from head to toe in bruises, and she couldn't get up and just laying there.

The last incident was one where

> [T]hey were arguing again, and this time Mom decided that she was going to leave, and so she grabbed me and the keys and we tried to get out of the house, but he was following us outside and so, he managed to grab the keys out of her hands and

15

threw them to the creek beside the house, and so while he was still yelling and stuff, we were searching the ground to try to find the keys, and then we finally found them and were able to leave.

Stephanie told no one about the abuse at the insistence of her mother.

Although he claimed that he had nothing to do with Rebecca's death, Moulton never denied the domestic abuse.

> Q       Well, you testified that during your marriage to Becky, you slapped her around four or five times.
> A       That's right.
> Q       But that was early in the marriage, right?
> A       That's right.
> Q       And I think you told me that in the last ten years of your marriage there wasn't any physical abuse, very little.   Was there some?
> A       I would say a couple of times.   Yes, there was.

Moulton called the abuse "mutual" and stated Rebecca could be physically abusive when she did not take her medication.   He claimed that the last time he slapped her was eight or nine years before her death.   Moulton admitted that the couple was having marital problems, that he moved into a motel, and that he thought about divorcing Rebecca around February 2003.

### F.       Questions Arise After the Funeral

Stephanie, who described her relationship with Moulton as "very tense," came to believe Moulton "had done something."   Stephanie found the circumstances of her mother's death odd. Specifically, she said her mother would not go for a walk to the pond, and would instead stay on the road.   Stephanie reasoned that her mother would not traverse the leafy trails and dense woods with flip-flops because there were snakes and briars.   She also found it odd that her mother was

16

not wearing her necklace and earrings, which she wore all of the time. When she saw her mother's jewelry at the funeral home, Stephanie questioned why the delicate chain on the necklace was broken.

Contrary to Stephanie's testimony, several of Moulton's relatives testified that they had observed Rebecca walking without wearing any jewelry. Monique Irwin, Moulton's daughter, testified that Rebecca did not wear any jewelry, that she "never recall[ed] seeing her wear a necklace," and that Rebecca was outdoorsy and had a garden. Moulton claimed that Rebecca was not wearing any jewelry and that her necklace was broken.

Stephanie also questioned Moulton's behavior after Rebecca's death. Moulton did not give Stephanie any money to purchase a tombstone for Rebecca. He talked about selling the house prior to the funeral. Stephanie testified, "I was suspicious along the way, but I didn't want to say anything until I had an autopsy report, and so that's when I got -- it was confirmed."

Dean was also confused about Moulton's behavior after Rebecca's death. When asked what flowers to get for the funeral, Moulton replied, "Get whatever you want, I don't care." Dean testified, "Lela asked him, she said, David, do you have something that you loved to see her in, that you loved to see her? And he said, I ain't picking out clothes for no woman." When Dean confronted him about the suspicious nature of Rebecca's death, Moulton said "that we were turning Stephanie against us because we were accusing him and that she was not going to have

17

anything else to do with us." Dean testified that it "appeared that David had lied" with respect to whether Stephanie was upset with Dean or did not want to have anything to do with her.

### G. Money and Marital Issues

Stephanie said money was a source of tension in the relationship. Speaking of insurance proceeds from the destruction of the couple's first home, Stephanie said that "Mom pretty much controlled the money and so David didn't have access to it, and then he got really angry about it and then left for a couple of weeks and they were going to divorce, basically. . . . It was in a safety deposit box, and only Mom and me were on the deposit box." The couple did not divorce, and when Moulton came back, he had access to the money in the safety deposit box, some of which he used to buy a six- or seven-year-old used work truck because his other one "had been totaled."

Moulton revealed that Rebecca was the breadwinner. He was injured on the job, received workman's compensation, claimed on tax forms that he was disabled and received no income, but still took jobs trimming trees. They owed the IRS $39,000.00 and had a debt of $9,165.00 on a travel trailer at the time of Rebecca's death. For household expenses, Rebecca borrowed against her savings. In the past, Moulton experienced two farm equipment fires, and the first house on the property had burned down. Moulton collected insurance money for the three separate instances. He also collected on Rebecca's life insurance benefits. On the form, he said, "All the information we can gather, it appears that my wife's death was from natural causes, aspiration of food." This

18

statement was made even though the autopsy report was "suspicious for homicide."   In any event, the insurance company had a copy of the first autopsy report.

After deliberating over the above-mentioned evidence for five hours, the jury rendered a verdict of guilt.

## II.   Trial Court Did Not Err In Overruling Moulton's Motion to Quash the Indictment

In a three paragraph indictment, the State alleged "**DAVID LEN MOULTON** did then and there knowingly or intentionally cause the death of an individual, namely, Rebecca Moulton, by manual strangulation by holding the said Rebecca Moulton's neck with the said defendant's hand in a manner that would cause death by asphyxiation," "did then and there knowingly or intentionally cause the death of an individual, namely, Rebecca Moulton, by drowning the said Rebecca Moulton in a pond," and "did then and there knowingly or intentionally cause the death of an individual, namely, Rebecca Moulton, by asphyxiation by means unknown to the grand jury."

We review de novo a trial court's denial of a motion to quash.  *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007).   A charging instrument which tracks the language of a criminal statute possesses sufficient specificity to provide a defendant with notice of a charged offense in most circumstances.  *State v. Edmond*, 933 S.W.2d 120, 128 (Tex. Crim. App. 1996) (citing *Bynum v. State*, 767 S.W.2d 769, 778 (Tex. Crim. App. 1989); *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim. App. 1988)).   The indictment must state facts which, if proved, show a

19

violation of the law; the indictment must be dismissed if such facts would not constitute a criminal offense. *Posey v. State*, 545 S.W.2d 162, 163 (Tex. Crim. App. 1977).

Moulton does not argue in his brief that the indictment failed to provide him with notice of the crime for which he was charged. Rather, he complains that because the State's indictment was written in the disjunctive,[8] it alleged the factual impossibility that Moulton murdered Rebecca three times. This led to the complaint in the motion to quash that "[t]he alternate theories may lead to surprise of the defendant at trial making him unable to adequately prepare and defend this case" and that the "alternate theories may lead to a verdict which, in effect, dispenses with the constitutional requirement of 'jury unanimity.'"

As to the claim that the indictment alleged three different murders, a factual impossibility that would lead to surprise, "[a] count may contain as many separate paragraphs charging the same offense as necessary, but no paragraph may charge more than one offense." TEX. CODE CRIM.

---

[8]The State responded to Moulton's complaint that the indictment was disjunctive by arguing that since the beginning of each paragraph started with the word "and," the indictment was pled in the conjunctive. We conclude that whether the indictment was conjunctive or disjunctive is not a dispositive issue that the trial court was required to resolve at the motion to quash stage of the proceeding. It has been held that "although the indictment may allege the differing methods of committing the offense in the conjunctive, it is proper for the jury to be charged in the disjunctive." *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (citing *Vasquez v. State*, 665 S.W.2d 484, 486–87 (Tex. Crim. App. 1984), *overruled on other grounds by Gonzales v. State*, 723 S.W.2d 746 (Tex. Crim. App. 1987); *Zanghetti v. State*, 618 S.W.2d 383, 387–88 (Tex. Crim. App. 1981)). Conversely, it is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted, and the same offense is being alleged. *Id.* (citing *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987) (op. on reh'g); *Bailey v. State*, 532 S.W.2d 316, 322–23 (Tex. Crim. App. 1976)). Also, if an indictment disjunctively alleges alternate theories of committing the same result-oriented offense, they may be submitted disjunctively in the jury charge without violating the right to jury unanimity. *Gamboa v. State*, 296 S.W.3d 574, 582–83 (Tex. Crim. App. 2009) (citing *Kitchens*, 823 S.W.2d at 258). Of course, the key is whether the State was alleging the same offense. We conclude that in this case, the State was alleging the same result-oriented offense.

PROC. ANN. art. 21.24(b) (West 2009). The Texas Court of Criminal Appeals "has held that alternate pleading of the differing methods of committing one offense may be charged in one indictment." *Kitchens*, 823 S.W.2d at 258.

We find that the State's indictment was properly pled in accordance with Article 21.24 of the Texas Code of Criminal Procedure. Pursuant to Article 21.24, the State alleged that the same crime was committed either by manual strangulation, drowning, or asphyxiation by manner and means unknown. Further, "[a] count is sufficient if any one of its paragraphs is sufficient. An indictment, information, or complaint is sufficient if any one of its counts is sufficient." TEX. CODE CRIM. PROC. ANN. art. 21.24(c) (West 2009).

As to the argument regarding jury unanimity, the manner and means of committing this offense is not required to be found unanimously by a jury. *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006); *see also Sanchez v. State*, No. PD-0961-07, 2010 WL 3894640, at *7 (Tex. Crim. App. Oct. 6, 2010). Indeed, the United States Supreme Court has determined that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Schad v. Arizona*, 501 U.S. 624 (1991) (plurality opinion); *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990); *Kitchens*, 823 S.W.2d at 258. Therefore, an indictment can allege different manner and means of committing a crime, including manner and means unknown, without rendering the indictment duplicitous. *Zanghetti*, 618 S.W.2d at 386–87. In *Kitchens*, the Texas Court of Criminal Appeals rejected claims of failure to require juror

21

unanimity where the trial court submitted one application paragraph for capital murder which had been alleged in three separate paragraphs of the indictment. 823 S.W.2d at 257. Because the jury was not required to find the manner and means of Rebecca's death unanimously, Moulton was not entitled to a motion to quash based on this argument.

We overrule his first point of error.

**III.     Submission of the Manner and Means Unknown Allegation Was Erroneous**

Our review of error in this jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we determine whether error occurred, and then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32.

After the evidence closed, the trial court charged the jury that it could find Moulton guilty if it found he caused Rebecca's death:

> by manual strangulation by holding the said Rebecca Moulton's neck with the said defendant's hands in a manner that would cause the death by aspiration; or,
> . . . drowning the said Rebecca Moulton in a pond; or,
> . . . by asphyxiation by manner and means unknown; . . . .

The jury was further instructed that it was not necessary to unanimously agree as to whether the death was caused by manual strangulation, by drowning, or by asphyxiation by manner and means unknown, but the jury members had to unanimously agree that Moulton intentionally or knowingly caused the death.

22

Moulton argues that the trial court erred in overruling his objections to the jury charge. Specifically, he complained that submission of the manner and means unknown allegation was not supported by the evidence. Moulton argues he was harmed by the submission of "asphyxiation by manner and means unknown" because the evidence was legally insufficient to establish the State's two alternate theories, manual strangulation and drowning.

We believe that a history of caselaw involving manner and means unknown allegations is helpful to the disposition of this point of error. We begin our discussion with *Corbett v. State*, 493 S.W.2d 940 (Tex. Crim. App. 1973). Prior to the introduction of the hypothetically correct jury charge concept, the State was required to prove, with sufficient evidence, the elements contained as alleged in the indictment. Where the indictment alleged that the means of causing death was unknown to the grand jury, such an allegation was considered material and was required to be proved by the evidence at trial. *Id.* at 952. This requirement was deemed sufficiently met if the facts at trial demonstrated that the means of death was uncertain. *Id.* However, where the evidence at trial showed that the means were known or could have become known through the exercise of reasonable diligence, the State was required to prove that the grand jury in fact exercised due diligence, but was unable to decipher the means of committing the offense. *Id.*; *Hicks v. State*, 860 S.W.2d 419, 424 (Tex. Crim. App. 1993), *overruled by Rosales v. State*, 4 S.W.3d 228 (Tex. Crim. App. 1999).

This requirement became known as the *Hicks* rule. Generally, the issue was raised when the sufficiency of evidence was challenged. Because the contention in such cases was that the evidence at trial was insufficient to prove that the manner and/or means were unknown, and the manner and means unknown allegation was considered a material allegation which the State had to prove, challenges came in the form of allegations that there were fatal variances between the indictment and evidence. *Hicks*, 860 S.W.2d at 424–25; *Corbett*, 493 S.W.2d at 953. If the evidence at trial did not establish the manner and means as unknown, the State either called a member of the grand jury to testify that they exercised due diligence, but were unable to determine the manner and/or means, or elicited such testimony from witnesses who interacted with the grand jury. *Hicks*, 860 S.W.2d at 424–25; *Corbett*, 493 S.W.2d at 953; *Guerra v. State*, 690 S.W.2d 901, 907–08 (Tex. App.—San Antonio 1985, no pet.).[9]

In 1997, the Texas Court of Criminal Appeals reasoned that analyzing sufficiency of the evidence based upon the indictment and resulting jury charge given "permit[ted] the greatest form of relief in the criminal system -- an acquittal -- to be granted because the defendant received a windfall in the jury instructions," *Malik v. State*, 953 S.W.2d 234, 239 (Tex. Crim. App. 1997). Thus, the Texas Court of Criminal Appeals announced

> sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. Such a charge would be one that accurately sets out the law, is authorized by the indictment, does

---

[9]Even though the issue was usually raised as a sufficiency challenge, at times the complaint was couched as a failure to provide proper notice to allow a defense to an allegation that the manner and means were unknown. *Persons v. State*, 714 S.W.2d 475 (Tex. App.—Fort Worth 1986, no pet.).

> not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.

*Id.* at 240. In effect, *Malik* "changed the analysis so that the indictment as presented [was] not the basis by which sufficiency of the evidence is now measured." *In re A.J.G.*, 131 S.W.3d 687, 694 (Tex. App.—Corpus Christi 2004, pet. denied).

In light of *Malik*, the concept of a manner and means unknown allegation in the jury charge was revisited in *Rosales*. 4 S.W.3d at 230. *Rosales* held that the due diligence requirement was met when a member of the grand jury testified the jury was unable to determine the manner and means. *Id.* at 231. While *Rosales* applied the *Hicks* rule, it also stated that the *Hicks* rule, requiring the State to prove that a manner and means was unknown, was no longer viable in light of *Malik*. This led to confusion among the courts as to whether failure to prove manner and means unknown, where alleged in the State's indictment, was still considered a material variance in light of *Malik*.

When faced with a similar situation, we stated in *Fagan* that the purpose for the *Hicks* rule "is to ensure that a defendant will have adequate notice of the charge against him and to guard against weakening the adequacy of notice that may be caused by a variance[10] between the

---

[10]A variance between the wording of the indictment and the evidence presented is fatal only if it is material and also prejudices the defendant's substantial rights. In other words, if the indictment fails to inform the defendant of the charge against him or her sufficient to allow the defendant to prepare an adequate defense, and if the defendant would be subjected to the risk of being prosecuted later for the same offense. *Fagan v. State*, 89 S.W.3d 245, 248 n.2 (Tex. App.—Texarkana 2002, pet. ref'd).

25

allegation and the proof." 89 S.W.3d at 249. While acknowledging *Malik* and its progeny holding that a jury charge need not incorporate allegations giving rise to immaterial variances, we stated:

> The Texas Court of Criminal Appeals has expressly disavowed the "due diligence" rule set out in *Hicks*. We therefore conclude that the rule has lost its underpinning as well as any reason for its existence. As required by *Gollihar*, we now look directly to issues of notice and the materiality of any variance between the indictment and charge to see if reversible error is present. Accordingly, although the state may still be required to show that the grand jury exercised due diligence in providing adequate notice to the defendant, the rule requiring the state to show that the grand jury exercised due diligence in determining the instrumentality of the offense is no longer relevant to our analysis except as it might apply to a review of adequacy of notice.

*Id*. We concluded Fagan was given proper notice by an allegation of sexual abuse by use of his sexual organ or with an object unknown to the grand jury. The evidence sufficiently supported a finding of assault by the use of the sexual organ. *Id*.

In a case which was designated to be published, but has not yet been released due to pending motions for rehearing, the Texas Court of Criminal Appeals has agreed with our rationale in *Fagan*. *Sanchez*, 2010 WL 3894640.[11] *Sanchez* reiterated that the *Hicks* rule is no longer viable, not only due to the holding in *Malik*, but because while *Hicks* was based upon the premise

---

[11]We realize that an opinion that is not final is not a part of Texas' jurisprudence. *Komurke v. State*, 562 S.W.2d 230, 235 (Tex. Crim. App. 1978), *overruled on other grounds by Cooper v. State*, 631 S.W.2d 508 (Tex. Crim. App. 1982); *see also Yeager v. State*, 727 S.W.2d 280, 281 n.1 (Tex. Crim. App. 1987). The *Sanchez* opinion will not be final until fifteen days after any motion for rehearing is ruled upon. TEX. R. APP. P. 231. Several motions for rehearing were filed in 2010, and are still currently pending. However, we feel that reference to this important case is necessary. Moreover, although this case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

of notice to a defendant, as we stated in *Fagan*, the *Hicks* rule postponed the "unknowness" inquiry until the trial, and was thus ineffective. *Id.* at *1, 4–5 (recognizing split among courts of appeals). *Sanchez* quoted our State Constitution for the fundamental concept that "no person shall be held to answer for a criminal offense unless on an indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary . . . ," reiterated the importance of the concept that "the grand jury's failure to determine the manner and means must be pled in the indictment in order to give notice to the defendant," and created a new procedure allowing a challenge to the unknown allegation on the basis of improper notice, both before trial and at the conclusion of the presentation of evidence. *Id.* at *4 nn.20, 21 (quoting TEX. CONST. art. I, § 10; *Garrett v. State*, 682 S.W.2d 301, 308 (Tex. Crim. App. 1984)).

In *Sanchez*, the Texas Court of Criminal Appeals found that the *Hicks* rule requiring proof of the unknown manner and means had morphed into one affecting jury charges and sufficiency of evidence challenges and had lost both its intent and focus, causing it to be easily misunderstood and misapplied. *Id.* at *4. Consequently, the *Hicks* rule was overruled and a new standard or procedure for testing the "unknown" allegation was adopted to assure the defendant has fair notice of the charges and to clarify the jury charge. *Id.*[12]

Here, we can eliminate the issue of whether Moulton received adequate notice of the charges in the indictment. Since the indictment contained allegations regarding both an

---

[12]*Sanchez* made it clear that an indictment alleging an unknown manner and means was still authorized, but it essentially changed the inquiry concerning an "unknown" manner and means from the arena of sufficiency of the evidence into a question of adequacy of notice and jury charge error determinations.

"unknown" manner and means and also specific ones, Moulton was not denied proper pretrial notice to defend the crime for which he was charged; the remaining issue involves the propriety of the jury charge in light of the evidence presented.

This new standard directs the trial courts and attorneys to review the evidence of a manner and means "unknown" allegation at a charge conference and clarify if the evidence justifies a submission that the manner and means were truly unknown or whether specific acts were shown to constitute the manner and means of the commission of the crime. In *Sanchez*, the jury charge was erroneous "because the indictment contained an allegation of 'manner and means' to the grand jury unknown" when the manner and means were not truly unknown.

Cases such as *Fagan* and *Sanchez*, where the manner and means is not an element of the offense, do not involve the sufficiency of the evidence under *Malik*, requiring acquittal. *Id.* Rather, they involve (1) whether adequate notice has been given to prepare for trial and (2) evidence actually presented requires that "unknown" allegation be replaced in the jury charge with language that requires a particular fact to be found in order to convict. The remedy for such a trial error, unless it is found to be harmless, is a new trial. *Id.* at *6.

In order to address the merits of Moulton's claim, we first analyze the facts in *Sanchez* and its reasoning. In that case, two guests in a motel room called police after hearing a woman screaming in the room next door. *Id.* at *1. Officers rushed into the adjoining room to discover

28

Sanchez lying next to the body of his dead girlfriend. *Id.* Her neck and face were bruised, and there were distinctive marks of a stun gun on the skin of her neck and chest.

In four disjunctive paragraphs, the State alleged Sanchez did then and there:

(1) "intentionally and knowingly cause the death of [the victim] by choking her with his hand;"
(2) "intentionally and knowingly cause the death of [the victim] by manner and means to the Grand Jurors unknown;"
(3) "with intent to cause serious bodily injury to an individual . . . commit an act clearly dangerous to human life, to-wit: by placing a stun gun on the person of the said [victim], that caused the death of said [victim];" and
(4) "with intent to cause serious bodily injury to [the victim], commit an act clearly dangerous to human life, to-wit: by manner and means to the Grand Juror[s] unknown, that caused the death of said [victim]."

*Id.*

Asphyxia by strangulation was listed as the cause of death on the autopsy report, and asphyxia was defined as lack of oxygen to the brain. *Id.* However, at trial, the medical examiner testified he could not conclusively determine what caused the asphyxia, although his findings were "consistent with an asphyxia by strangulation." *Id.* at *1–2. The examiner could not conclusively determine whether manual strangulation or the stun gun caused the asphyxia. *Id.* at *1.

On appeal, and as presented in this case through the briefing and objection to the charge below, the issue was jury charge error with regard to the submission that asphyxiation was by a manner and means unknown. *Id.* at *4. *Sanchez* recognized that for murder, "[n]either the

29

manner-the *actus reus*-nor the means-the 'instrument of death' -need be found unanimously by a jury." *Id.* at *7.[13]

The court explained that "manner and means to the grand jury unknown" could be either unknown evidence, or unknowable evidence. *Id.* at *7.

"Unknown" evidence is evidence that cannot be or has not yet been ascertained, such as a murder weapon or perhaps even the cause of death. "Unknowable" evidence, however, differs from the failure to find evidence. It is evidence that has been ascertained, but cannot be comprehensively known. In essence, it is the difference between an open-ended question and a multiple-choice question which

---

[13]But again, the new standard's main focus is on notice and the jury charge. To this effect, the court defined the new procedure:

Where the State has alleged "unknown" manner and means in the indictment and/or jury charge, the defendant may challenge the propriety of the "unknown" allegation before trial and (if the evidence at trial has made a second inquiry necessary) at the conclusion of evidence, but before the charge is submitted to the jury.

The first question (whether raised before or during the trial) is whether the defendant was given proper notice so that he could properly prepare for trial. The second question is whether an "unknown" allegation in the indictment should be replaced by language in the charge that requires a particular fact to be found in order to convict.

The pre-trial hearing will ensure that the "unknown" allegation was truly unknown to the grand jury and is not being used to surprise or manipulate the defendant at trial. This hearing replaces the *Hicks* test, but does not require proof of "unknownness" at trial. Instead, it permits hearings that will, at the very least, elicit all evidence that is now known so that the "unknown" aspect of the case can be minimized or eliminated by amendment of the indictment or the presentation of a superseding indictment.

Similarly, a post-evidentiary hearing is available to the defendant by request after the evidence has been presented and both sides have rested, but before the jury is charged. If the "unknown" allegation has become known through the evidence presented at trial, it might still have been unknown to the grand jury as stated in the indictment. If this is the case, then the "unknown" allegation has since been discovered and made known. This additional hearing will force both sides to revisit the "unknown" allegation from the indictment, and clarify that it is either known, "unknown," or unknowable, before the court completes its charge to the jury.

*Id.* at *5–6.

gives several options to the finder of fact.  When all evidence that can be produced is produced, but it is impossible to determine manner and means, then the manner and means is "unknowable."

*Id.* at *7.

The court reasoned that the medical cause of death was asphyxia and that what caused the asphyxia was at issue.  *Id.*  Thus, the State was not required to prove that the defendant asphyxiated the victim, but rather, that "the legal element of the crime, which is that the appellant caused the death of the victim."  *Id.*  There, the court explained that the manner and means "could have been manual strangulation, ligature strangulation, blocking the air passages, or the use of the stun gun, or even any combination of these methods."  *Id.*  But because the medical examiner testified the manner and means "was either by strangulation or by the stun gun, or even by a combination of the two," these were the only manner and means which could have been presented to the jury.  *Id*. at *7–8.  *Sanchez* recognized that after all of the evidence that could be produced was produced, it was not possible to determine the manner and means of the asphyxia. *Id.* at *8.  Therefore, the manner and means was unknowable.  *Id.* at *9.  In other words, the testimony presented a known choice of several options.  Because the testimony presented a known choice of several options, the manner and means was not "entirely unknown."  *Id.*  Thus, the jury charge should have been amended to remove the submission of "manner and means unknown," and should have, instead, simply given the jury the multiple choices presented by the evidence.  In those circumstances, the jury should not be given the option to determine guilt by a

31

finding that the manner and means of death were unknown, but "should be replaced by language in the charge that requires a particular fact to be found in order to convict."  *Id.* at *5.

Moulton's argument reiterates that according to *Sanchez*, submission of the "manner and means unknown" allegation in this case, where the manner and means was unknowable, constituted error.  In oral argument, the State candidly conceded that if this Court applies *Sanchez*, the charge was erroneous, but the State urges that it is a harmless error.  Employing *Sanchez*'s reasoning, as well as our reasoning in *Fagan*, we conclude the charge was erroneous.

Here, the indictment read in three separate paragraphs that "**DAVID LEN MOULTON** did . . . cause the death of . . . Rebecca Moulton, by manual strangulation by holding the said Rebecca Moulton's neck with the said defendant's hand in a manner that would cause death by asphyxiation," "did then and there knowingly or intentionally cause the death of . . . Rebecca Moulton, by drowning . . ." and "did . . . cause the death of . . . Rebecca Moulton, by asphyxiation by means unknown to the grand jury."   The medical examiner in this case testified that while she believed Rebecca's death was caused by asphyxia, the means "[c]ould be drowning, could be strangulation, could be suffocation.   We can't specifically pick which one, because when you deal with an asphyxial type death, the findings are very subtle."

Thus, as in *Sanchez*, after all of the evidence that could be produced was produced, there was a known choice of several options.   These were the options which should have been

32

submitted to the jury because the manner and means was not entirely unknown. *Id.* at \*9.[14]

Therefore, as in *Sanchez*, the jury charge should have been amended to remove the submission of the manner and means unknown allegation, and failure to do so resulted in the submission of an erroneous jury charge.[15]

## IV.  The Erroneous Jury Charge Submission Amounted to Some Harm to Moulton

Even if the submission of the charge was erroneous, "the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006). "Preserved jury charge error is evaluated under *Almanza*'s 'some harm' standard unless [it is] determine[d] that the error is constitutional in nature, in which case the 'beyond a reasonable doubt harmless' standard would apply." *Williams v. State*, 273 S.W.3d 200, 224 (Tex. Crim. App. 2008); *see Almanza*, 686 S.W.2d at 171. In *Sanchez*, the Texas Court of Criminal Appeals found that Sanchez's objection that the manner and means were unsupported by evidence was sufficient to preserve error. *Sanchez*, 2010 WL 3894640, at \*2. Here, the record establishes that Moulton objected to the "submission of all three

---

[14]We realize this trial occurred before the *Sanchez* decision was released and the attorneys and judge were not aware of the new procedures established. Nevertheless, the issue ultimately is jury charge error which cannot be forfeited and only has application to the level of review when considering whether error is harmless. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). In *Sanchez*, the Texas Court of Criminal Appeals found the trial court erred even though it announced the new procedure in that case.

[15]*Sanchez v. State*, 221 S.W.3d 769 (Tex. App.—Corpus Christi 2007), *rev'd*, No. PD-0961-07, 2010 WL 3894640 (Tex. Crim. App. Oct. 6, 2010) (Texas Court of Criminal Appeals, in reversing, concluded submission of jury charge was erroneous).

paragraphs of the indictment." At trial, he complained that the submission "invit[ed] less than a unanimous verdict" and that "there's no credible cause of death evidence concerning . . . . asphyxiation by an unknown means." We find Moulton's objection sufficiently preserved the issue; thus, we will employ the *Almanza* "some harm" standard.

"[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

### A.    Jury Charge Instructions

Analysis of the jury charge suggests there was some harm to Moulton. The application paragraphs of the jury charge instructed the jury to find Moulton guilty if it found he manually strangled Rebecca, or drowned Rebecca, or asphyxiated her by manner and means unknown. As previously stated, the trial court instructed the jury that it did not need to unanimously agree whether Moulton caused the death by strangulation, drowning, or asphyxiation by manner and means unknown, but only had to be unanimous that Moulton intentionally or knowingly caused Rebecca's death.

Finally, the question asked of the jury was simply whether it found Moulton "'[g]uilty' of the offense of murder as alleged in the indictment." Because submission of the third option was error, and the nature of the charge *could* have provided for conviction based upon the manner and

34

means unknown allegation, there is a *possibility* that Moulton suffered some harm from the erroneous submission. However, "a defendant must have suffered 'some' actual, rather than theoretical, harm from the error." *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (citing *Almanza*, 686 S.W.2d at 171). Because only theoretical harm is shown from the charge itself, we move to an analysis of the evidence.

### B.     The Evidence

In *Sanchez*, the trial court instructed the jury to consider several alternative means of the cause and manner of death, one of which was "unknown." Even though such a submission of "unknown" means was an error, the Texas Court of Criminal Appeals, employing the *Almanza* "some harm" standard, considered whether the error was harmful. In finding no harm, the court explained that not only was there "sufficient evidence" to prove at least one of the alternate means (other than "unknown"), but also that the evidence "overwhelmingly" supported a conviction on alternative theories. Consequently, the error in submitting an "unknown" manner and means where the manner and means was actually not entirely unknown, did not cause harm. *Sanchez*, 2010 WL 3894649, at *9. This analysis was to measure the harm "at least in part, against the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability not affected by erroneous portions of the charge." *Id.* (quoting *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *overruled on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002)). "'The presence of overwhelming evidence of guilt plays a

35

determinative role in resolving the issue,' and is indeed a factor that can be considered when looking at jury charge error." *Id*.

In accordance with *Almanza*, we will review the "state of the evidence" as well as the weight of the probative evidence. *Almanza*, 686 S.W.2d at 171.

In its entirety, the autopsy report lists the following as evidence of injury:

> The lateral sclerae of the right eye is hemorrhagic. A 3/16 inch angulated red mark is present on the anterior neck base just left of midline near the jugular notch. The injury probes to less than 1/8 inch and a layered neck dissection reveals a 1 inch area of soft tissue hemorrhage within the fat just below the defect. A 1/2 inch area of intramuscular hemorrhage involves the superior aspect and inferior surface of the right sternocleidomastiod muscle. A 3/8 inch intramuscular hemorrhage involves the inferior aspect of the right sternohyoid muscle. The remainder of the neck dissection is unremarkable and the hyoid bone and thyroid cartilage are intact.

> Two 1/16 inch superficial lacerations involve the mucosal surface of the lower lip of the mouth. The sphenoid sinus is opened and contains thin clear fluid.

We will examine the autopsy report and expert testimony to analyze the evidence that Rebecca was manually strangled or drowned, injury by injury.

Dr. McClain testified that "[t]he lateral sclerae of the right eye" could be caused by "[s]ome sort of blunt trauma" directly to the eye prior to death. Additionally, there were "1/16 inch superficial lacerations [involving] the mucosal surface of the lower lip of the mouth." Blunt force trauma to the eye and the superficial lacerations on Rebecca's mouth do not provide any evidence relating to manual strangulation or drowning, as opposed to another manner and means of asphyxiation.

36

The State points out that Rebecca had some sign of neck injury close to the collarbone.   A "3/16 inch angulated red mark," probing "less than 1/8" of an inch was "present on the anterior neck base just left of midline near the jugular notch," there was puncture of the skin in that area, and Rebecca had "a one inch area of soft tissue hemorrhage within the fat just below the defect." Along the right side of the neck, Rebecca had "[a] 1/2 inch area of intramuscular hemorrhage involv[ing] the superior aspect and inferior surface of the right sternocleidomastoid muscle," and a "3/8 inch intramuscular hemorrhage involv[ing] the inferior aspect of the right sternohyoid muscle."

These injuries, however, were not described in the autopsy as injuries which caused Rebecca's death.   Rather, they were described as small and superficial injuries, and no witness testified that the injuries to Rebecca's neck were life threatening.[16]   No petechiae was present in the eye, which is seen in eighty-five percent of manual strangulation cases.   Also, there were no bruises or abrasions to the surface of Rebecca's neck area, and the autopsy showed that "[t]he remainder of the neck dissection [was] unremarkable and the hyoid bone and thyroid cartilage [were] intact."   As explained by defense expert witness, Dr. Bux, "the hyoid bone is the little bone that is above the larynx or the voice box.   It's a U-shaped bone and it's [sic] purpose is to give stability to the upper part of the airway."   "[T]he larynx is the voice box . . . it keeps, again, the structure open so you can breathe in and out without it collapsing, without the trachea collapsing

---

[16]McClain did testify that she has seen strangulation cases that are "very subtle; it only takes a little bit of pressure to cut off the blood flow to the brain.   So it's not like you're having to, you know, break someone's neck; it's just, you know, you cut off that blood flow and they don't get enough oxygen to the brain, they pass out and die."

and the upper airway collapsing when you breathe." Bux stated there was no way to know whether the 3/16-inch red mark near the jugular notch was a pre- or post-death injury. However, first responder Camp testified there was no jugular vein distension, and no signs of neck injury, although medical records establish that the neck was examined. At the hospital, no signs of injury to the neck were documented. There were also no signs of struggle on Rebecca, which would be expected from a healthy adult fighting for their life.[17] A toxicology screen produced no results, and no foreign DNA was found under Rebecca's fingernails. The initial autopsy, which was amended, but not as a result of additional medical evidence, produced the finding that Rebecca "died as the result of undetermined causes." Further, even if we looked at this evidence in the light most favorable to the judgment, no evidence was presented that such injury to the neck was the result of manual strangulation caused by pressing the hand to the neck, as opposed to ligature strangulation, or some other method of strangulation.

As to the allegation of drowning, Detective West testified there were no signs of struggle on the body or around the pond area. There was no mud or foreign DNA under Rebecca's fingernails. The autopsy report reflected pulmonary edema and intra-alveolar hemorrhage, which McClain testified were nonspecific findings that while seen "in drownings," is seen "really in

---

[17]Dr. Bux testified, "I'd expect to see multiple injuries on the skin that could be either straight due to a finger coming in or raking down, getting a scratch, or kind of -- an ellipse from a fingernail mark. I'd expect to see other areas of bruising on the surface of the skin, and abrasions. Those are the things that you typically see on the outside of the neck."

every autopsy."[18]   There was mention of thin clear fluid in the sphenoid sinus, which McClain also regarded as nonspecific.   Emergency medical personnel who cleared Rebecca's airways did not note fluid in her lungs, though the assessment was listed as "suspected accidental drowning." Although the medical records list the complaint as "drowning victim found in pond," this statement was the initial assessment based upon information gathered from Moulton that his wife fell in the pond.   Drowning was not mentioned in the autopsy report.   Again, McClain testified that her office was unable to determine the cause of death with this medical evidence.

Given the state of the evidence, the means which caused Rebecca's death is unclear. While jury unanimity is not required as to the manner and means, in *Sanchez* the evidence "overwhelmingly" supported a conviction that death occurred in accordance with alternate theories alleged in the indictment. (The expert testified he was ninety-five percent sure that asphyxia was the result of manual strangulation, the defendant was found lying next to the decedent in a motel room registered in his name, his vehicle was parked in front of the room, and there was no alternative means of exiting the room.)   Such overwhelming evidence was sufficient to remove any harm from jury charge error in the submission of the manner and means unknown allegation.   Here, the State's expert could not provide such definitive evidence and stated that the asphyxia "[c]ould be drowning, could be strangulation, could be suffocation."   Further, she

---

[18]McClain also testified that a body sinks when it is drowned.   According to Moulton's testimony, Rebecca was found floating in the pond.

39

stated, "I can't tell you if it was strangulation, if it was suffocation, if it was drowning, or a combination of all three."

It is the obligation and responsibility of appellate courts "to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010) (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). Furthermore, "[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient [to convict]." *Id.* (quoting *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992)), *superseded in part on other grounds by Herrin v. State*, 125 S.W.3d 436, 443 (Tex. Crim. App. 2002). At best, we know that Moulton had been at home with Rebecca around the time of the killing, that he had committed domestic violence in the past which could lead to an inference of intent to kill, that Rebecca died an unnatural death, that she had neck injuries, and that her necklace was broken. Homicide is suggested by virtue of the fact that West suggested drag marks were present on Rebecca, McClain testified the injuries caused were inflicted, and the fact that Rebecca was found in flip-flops in the middle of a pond. Moulton's strange story that she was dropped from a gurney and that he witnessed a C collar being placed on her does not favor him. Nevertheless, we conclude, under our *Almanza* analysis, that the evidence of the cause and manner and means of death of the alternative theories, alone, does not rise to the level to remove the harm resulting from the improper jury charge as it did in *Sanchez*. One of the theories suggested was suffocation,

40

which was neither alleged in the indictment nor presented to the jury. Therefore, we believe the state of the evidence favors Moulton when addressing whether he was harmed by the manner and means unknown allegation.

### C.      Argument of Counsel

During closing argument, the State said, "All twelve of you don't have to agree on how he killed her. What you have to agree upon is that he killed her on April 17, 2004." This would have been a correct statement were it not for the erroneous submission of the manner and means unknown allegation. The State focused on the manner and means unknown allegation when it argued:

> Dr. Bux . . . said petechiae appear in 80, 85 percent and there ought to be a struggle. But we know historically that when David Moulton had attacked Becky Moulton there were some times that there wasn't a struggle, because -- and Elizabeth Browning said, 'Why didn't you fight back?' 'I couldn't. I couldn't breathe.'

> There's only two people that know what happened out there. One of them's dead and the other one's sitting behind me. That's why we had to plead this case as a manner and means unknown. We don't have to prove to you exactly what happened on that day. We have to prove to you beyond a reasonable doubt that David Moulton's responsible . . . .

Also, rather than try to prove death by manual strangulation or drowning, counsel argued, "How he got to her, I'm not exactly sure. Did he asphyxiate her? I know that beyond a reasonable doubt. How he did it exactly, I don't know."[19] The jury was read a statement given by Elizabeth

---

[19]The Texas Court of Criminal Appeals stated, in the *Sanchez* opinion, "Since 'cause of death' is a medical term, the State need not prove that the appellant 'asphyxiated' the victim. Rather, the State must prove the legal element of the crime, which is that the appellant caused the death of the victim." 2010 WL 3894640, at *7.

41

Browning that Moulton had previously suffocated Rebecca with a pillow and that she was unable to struggle at that time because she could not breathe. McClain also testified to suffocation as opposed to manual strangulation or drowning.

We find that counsel's argument supports the argument that Moulton suffered some harm from the submission of the manner and means unknown allegation because this allegation, coupled with testimony regarding suffocation, became the focus of the closing argument.

After reviewing the entire jury charge, the evidence, and argument of counsel, we conclude that submission of the erroneous manner and means unknown allegation to the jury resulted in "some harm" to Moulton under the *Almanza* analysis. We sustain this point of error.

## V. Admission of the Inadmissible Affidavits Under a Rule 705 Balancing Analysis Was Not Erroneous

Moulton complains that the trial court erroneously allowed the hearsay affidavits[20] contained in McClain's file to be read into the record based on Texas Rules of Evidence 703 and 705.

We review the trial court's admission of evidence for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Harris v. State*, 133 S.W.3d 760, 770 (Tex. App.—Texarkana 2004, pet. ref'd). An abuse of discretion occurs only when the trial court's decision "was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Harris*, 133 S.W.3d at

[20]The affidavits, previously summarized, were not admitted into evidence.

770–71 (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any applicable legal theory. *Dixon*, 206 S.W.3d at 590.

When Dr. McClain initially was questioned by the State, she revealed that the autopsy report had been amended based on investigative findings presented after the autopsy was performed. At that time, the State did not attempt to present the additional underlying investigative facts the expert reviewed. During cross-examination of McClain, Moulton suggested the statements could have been unreliable.

Rule of Evidence 703 "allows expert opinion testimony that relies on facts or data collected or reported by another when those facts or data are the type 'reasonably relied upon by experts in the particular field in forming opinions.'. . . even if the underlying facts or data are themselves inadmissible." *Tex. Worker's Comp. Comm'n v. Wausaw Underwriters Ins.*, 127 S.W.3d 50, 56–57 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). After defense counsel's cross-examination of McClain, the State moved to be allowed to read the affidavits that were supplied to McClain:

> Q And Dr. McClain, there are the kinds of statements that you would typically rely upon in your job as a medical examiner in arriving at a conclusion in terms of cause of death?
> A That's correct.
> Q And in fact, you did that in this case?
> A Yes, I did.
> Q Based on those statements?
> A Yes.

43

The trial court allowed the affidavits to be read into the record.

The concern is the actual disclosure of the inadmissible facts or data, as opposed to McClain's opinion. Rule 705 of the Texas Rules of Evidence, entitled Disclosure of Facts or Data Underlying Expert Opinion reads:

> **(d) Balancing test; limiting instructions.** When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial. If otherwise inadmissible facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request.

TEX. R. EVID. 705.

When conducting this balancing test, the trial court made reference to counsel's cross-examination of McClain, in which Moulton questioned the veracity of the affidavits which were used to form McClain's opinion:

> Q       [Referencing the affidavits] . . . . And once again, we go back to that garbage in-garbage out theory . . . .
>
> A       Well, these -- what I have are sworn statements and I don't think that's garbage from somebody.
>
> Q       Well, I'm not saying that's garbage either, but our common human experience tells us that people can -- I'm not going to start out with lie; I'm going to start out with, be mistaken. True?
>
> A       Well, you know, if you're making a statement, you're saying what you believe to be true.

44

Q      I think you may be mistaken about that.   Isn't that possible, Doctor?

A      It could be.   I've got more than one statement.

Q      Okay.   That's fair enough.   But you'll agree with me that sometimes people, their memory fades?

A      Yes.

Q      Sometimes they might outright lie?

A      Well, they might.

Moulton then went on to question certain statements that were contained within the J.P.'s report, suggesting they were false.

After reading Rule 705, the trial court stated:

Where we are now though is, is that defense has significantly called into question the validity of the medical examiner's conclusions on the basis that the investigative facts that she relied upon were so questionable that it then taints the opinions that she's made.   That leaves -- that opens the door to the jury being able to evaluate the investigative materials to determine whether or not the basis for her opinion are valid.

The trial judge clarified, "I think by questioning the validity of the opinions and the basis that those facts supporting the opinions are invalid, that opens the door to the admissibility of the hearsay and, . . . the hearsay evidence is admissible as a basis for the expert's opinion. . . . 703 and, in connection with 705(d), allows it to come in even if it would not otherwise be admissible into evidence."   The trial court thus addressed the underlying facts or data's value as explanation or support for McClain's opinion.

45

As to the danger that they will be used for a purpose other than as explanation or support or unfair prejudice, the judge ruled:

> Now I think that in light of the fact that this door has been opened that that -- that mitigates against any danger of unfair prejudice, because now the jury has got to determine what she looked at as a basis for her opinion to determine the validity of it and what weight to be given to the opinions of the expert.

Although prejudicial, the court determined it would not be unfair to allow reading of the affidavits. In clarifying that his ruling was based upon the need for the jury to decide if McClain's opinion was supported by the affidavits and was reasonable, the trial court decided that there was no great danger that the affidavits would be used for a purpose other than as explanation or support for the expert's opinion. During trial, Moulton did not argue that the affidavits were unfairly prejudicial, and he did not request a limiting instruction under Rule 705(d).[21]

Moulton's complaint on appeal, however, regards the finding that the affidavits were not unfairly prejudicial. The argument, in its entirety, is presented below:

> It is Appellant's position that the statements should not have come in because they are unfairly prejudicial. Of all the statements read by Dr. McClain, only one of the declarants was called as a witness by the State at trial. Appellant was not given the investigative file containing the statements prior to trial. Appellant had no way of combating this information when it was introduced, nor could Appellant's counsel conduct any investigation to confirm the reliability of the statements. As a result, the statements were unfairly prejudicial to Appellant, and the trial court abused its discretion by permitting Dr. McClain to read the same to the jury.

---

[21]During trial, Moulton focused on admissibility of the affidavits under Rule 705(c).

46

Rather than describing why a particular statement or statements were *unfairly* prejudicial, Moulton's argument raises other issues not before the trial court.[22]

We are left with the simple allegation that the affidavits were unfairly prejudicial. According to the reasoning employed by the trial court, disclosing the statements McClain relied upon in forming her opinion assisted the jury in evaluating the weight to give her opinions. *See Austin v. State*, 222 S.W.3d 801, 812 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Ramirez v. State*, 815 S.W.2d 636, 651 (Tex. Crim. App. 1991)). Although the statements were prejudicial and there was some risk the jury might use them for another purpose, we conclude the trial court did not abuse its discretion in determining this risk did not substantially outweigh their value as explanation and support for McClain's opinions. *See Austin*, 222 S.W.3d at 812. Therefore, we find the trial court did not abuse its discretion in allowing the reading of the statements upon which McClain formed her opinion.

---

[22]For example, Moulton complains that only one of the affiants was called by the State to testify at trial. Reading the affidavits of those not available to testify raises serious *Crawford* issues. *See Smith v. State*, No. 09-09-00380-CR, 2011 WL 1304874, at *5 (Tex. App.—Beaumont Apr. 6, 2011, pet. ref'd) ("Clearly, the rules of evidence do not trump a defendant's constitutional right to confrontation. *See Crawford*, 541 U.S. at 61. When the facts and data in a report explain and support a testifying expert's opinions only when the underlying data and facts are true, then the jury must consider the facts and data in the inadmissible report as substantive, rather than merely constituting the underlying basis for the expert's opinion. *See Martinez v. State*, 311 S.W.3d 104, 112 (Tex. App.—Amarillo 2010, pet. ref'd); *Wood v. State*, 299 S.W.3d 200, 213 (Tex. App.—Austin 2009, pet. ref'd). Under the circumstances presented here, the trial court's admission of this report over a timely and specific objection was constitutional error.")). However, the issue was not raised to the trial court, and a hearsay objection does not preserve error on Confrontation Clause grounds. *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005); *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004).

## VI.   Moulton Waived His *Brady* Complaint

Last, Moulton argues that *Brady* was violated when the State failed to previously disclose the affidavits and investigative materials on which McClain relied in amending the autopsy report from "undetermined" "suspicious for homicide" to "homicide."[23]

When evidence withheld in violation of *Brady*[24] is disclosed at trial, the defendant's "failure to request a continuance waives any *Brady* violation, as well as any violation of a discovery order."   *Taylor v. State*, 93 S.W.3d 487, 502 (Tex. App.—Texarkana 2002, pet. ref'd); *Smith v. State*, 314 S.W.3d 576, 586 n.3 (Tex. App.—Texarkana 2010, no pet.); *Jones v. State*, 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.) (holding defendant must request continuance and present *Brady* complaint in motion for new trial to preserve complaint for appellate review); *Apolinar v. State*, 106 S.W.3d 407, 421 (Tex. App.—Houston [1st Dist.] 2003), *aff'd on other grounds*, 155 S.W.3d 184 (Tex. Crim. App. 2005).

A review of the record reveals that Moulton failed to request a continuance after being presented with the investigative file.   Therefore, any *Brady* violation was waived.   *Smith*, 314 S.W.3d at 575 n.3 ("'failure to request a continuance waives any *Brady* violation' and indicates the evidence was, in fact, not material").

---

[23]We do not address the issues of whether such investigative materials, which were used to amend the autopsy report to including a finding of homicide, could be considered exculpatory.

[24]*Brady v. Maryland*, 373 U.S. 83 (1963).

## VII. CONCLUSION

Because we find Moulton was harmed by the submission of the manner and means unknown allegation in the jury charge, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.


Jack Carter
Justice

Date Submitted:     June 8, 2011
Date Decided:       October 19, 2011

Publish